STATE, Respondent v. BEST, Appellant

(232 N.W.2d 447)

(File No. 11353. Opinion filed August 22, 1975)

Samuel **Schaunaman**, Asst. Atty. Gen., Pierre, for plaintiff and respondent; **Kermit A. Sande**, Atty. Gen., on the brief.

**Laurence J. Zastrow**, Rapid City, for defendant and appellant.

DUNN, Chief Justice.

The defendant, Barbara Best, was convicted by a Pennington County Circuit Court jury of second degree manslaughter on May 31, 1973, in the death of her child, Steven Best. She appeals claiming the trial court committed error (1) in admitting the transcript of a statement given by the defendant, and in allowing the transcript and the testimony of Deputy Sheriff Holloway concerning the statement to be introduced without prior evidence to establish the corpus delicti; (2) in allowing certain expert witnesses to testify as to their opinions concerning medical matters in which they had no experience or training; (3) in allowing the testimony of Dr. Buss partly based upon hospital records not admitted into evidence; (4) in allowing certain statements of the state's attorney in closing argument which were improper and prejudicial; and (5) in permitting testimony to be presented on the "Battered Child Syndrome," and in failing to direct a verdict of acquittal in favor of the defendant for lack of proof of child abuse, and in instructing the jury on the issue of child abuse. We affirm.

Steven Best was born on June 1, 1971, and was the first natural child of defendant and her husband, Daniel. They had adopted a child, Timothy, some eleven months previous to this birth. Shortly after the birth of Steven, the couple was transferred to Ellsworth Air Force Base at Rapid City, South Dakota.

On September 19, 1971, Steven was first treated at the base hospital. He was brought in by his parents and was examined by Dr. Gregory Jelinek. The parents complained that the baby had been crying, was very irritable and was suffering from diaper rash. Dr. Michael Kellum, base pediatrician, was called in and found no evidence of any infection nor any particular reason why

the child should be crying. He did a palpitation of the bones, which proved negative, and could not detect any bone injury by feel. Dr. Kellum also noted that the end of Steven's penis was black. He asked that the child be returned to the clinic in one week, but this was not done.

On September 29, 1971, Steven, accompanied by his parents, was received at the emergency room of the base hospital. Dr. Robert Buss determined that he had suffered a fractured humerus of the left arm. Dr. Buss testified that this was an oblique fracture which would generally result from a torque-type (twisting) injury. The parents could not explain the injury other than to speculate that it might have happened in the crib. Dr. Buss set the arm and advised that the child be returned in one week. Steven was not returned until October 13th when Dr. Buss determined that the humerus had suffered a malalignment of the union. Dr. Buss testified that such a fracture was uncommon, and he discussed the possibility of child abuse at a staff meeting.

On November 15, 1971, defendant and her husband brought Steven to the hospital at Dr. Kellum's request. Upon examination, the doctor found evidence of poor diaper care, undernutrition and a slight bend in the left arm. Dr. Kellum suggested that the child be brought in every two to four weeks, and told defendant that unless some reason for Steven's failure to grow at the normal rate was found he might have to be hospitalized.

On December 2, 1971, Dr. Kellum again examined Steven and found weight loss and a bruise on one of his cheeks. At this point the doctor ordered hospitalization for the child. During the hospitalization Steven gained weight and his irritability decreased. It was also discovered through X rays that, in addition to the arm fracture, he had previously suffered fractures of two left ribs and a possible fracture of one of his right ribs. In response to the question as to the incidence of such fractures in a child of Steven's age, Dr. Kellum testified that

"It's not very common at all, and because of the fact that it's not very common this is why we made the official legal move of labeling the child as a possible victim of Battered Child Syndrome."

Dr. Kellum also testified that he felt there was no abnormality in Steven's bone structure and no particular susceptibility to bruising was indicated.

When informed of the rib fracture, defendant testified that she felt this could have been caused by the collapse of Steven's crib. According to the defendant's testimony, this crib had collapsed on at least five occasions.

Steven was released from the hospital on December 17, 1971, and was returned to the clinic on December 28, 1971. Dr. Kellum examined him and determined that weight had not increased and that he was suffering from a mild diaper rash and a cold. In the meantime, and on December 21, 1971, Kathy Daniels of the South Dakota Welfare Department had been assigned to the case and had made her first visit.

Steven was again examined at the base hospital on January 24, 1972. At that time Dr. Kellum observed a slightly raised bruise on his forehead and an area of pinhead type bleeding into the skin in the shape of an adult finger. When questioned, the parents speculated that Timmy had possibly hit Steven.

On February 23, 1972, Steven was admitted to the emergency room suffering from a skull fracture at the back of the head. Defendant stated that she had fallen down the stairs while carrying the child. Dr. Lawrence Mason, base pediatrician, also treated Steven and testified that such a fracture was relatively common.

Upon Steven's release from the hospital, he was taken into custody by the South Dakota Welfare Department and was placed in a foster home. During this period in the foster home Steven gained weight, his diaper rash cleared and he appeared happy and sustained no permanent damage from the skull fracture. He did suffer an ear infection during this period.

On September 15, 1972, Steven was released to his parents. From this date until the date of Steven's death, November 26, 1972, none of the doctors from the base hospital saw Steven. Mrs. Elaine Harrison was the volunteer social worker assigned to the case during this time and visited the Best home with her husband

on a number of occasions. Neither of the Harrisons ever saw Steven struck with a closed hand or fist by either of the Bests during this time.

Mrs. Best testified that on the morning of November 26, 1972, she awakened and, after determining that the children were still asleep, began to eat breakfast. About 9 or 9:30 a. m. she heard Steven fussing and brought him downstairs. She testified that she went to a storage room where diapers were kept and heard a cry from Steven. Upon returning to the living room, Timothy was going up the stairs muttering that "baby hurt." Mrs. Best testified that she picked Steven up and rocked him until he stopped crying. She then changed his diaper and dressed him. A few moments later Mrs. Best placed Steven in his highchair. She testified that upon returning from preparing food for him he had "stiffened up." Mrs. Best called for her husband who came downstairs, and, after an application of ice on a bruise on Steven's head failed to revive him, Dr. Kellum was called. When Dr. Kellum arrived Mrs. Best explained that she thought Steven had possibly fallen on a telephone which was in the area where she found him. Steven was first taken to the Ellsworth Air Force Base hospital emergency room, and, upon his failure to respond, Dr. Kellum contacted Dr. Edward James, a neurosurgeon at St. John's McNamara Hospital, and Steven was transferred there. In spite of emergency treatment, the child died about 1 p. m. at the age of approximately 18 months.

At 2:30 p. m. on November 26, 1972, an autopsy was performed on Steven Best by Dr. John Elston, a pathologist. The autopsy revealed that Steven was suffering from malnutrition and that he had a large number of bruises of varying age on his forehead, face, abdomen, lower and upper extremities, back and buttocks. Dr. Elston found two fresh hemorrhages—one behind the left ear and one behind the right ear—and a small fracture behind the right ear. The autopsy also revealed a massive fracture behind the left ear with a displaced segment of the skull bone approximately two inches long which had lacerated the brain and a hairline fracture in the midline of the posterior of the skull. The autopsy further revealed that the cerebellum showed discoloration and healing which would have pre-existed the fracture and would have been caused by prior trauma to the skull. Dr. Elston

testified that the cause of death was the massive fracture of the skull with the resulting laceration of the brain and the major vessels of the brain which had caused internal hemorrhaging in the skull. He stated that the fatal fracture was caused by a blunt, as opposed to a sharp, instrument; that the only way all of the fractures could have been caused by one blow "would be for the head to have been struck on the left side and then hit against an object on the other side, such as a table or something of [that] sort;" that it was doubtful that the fractures could have been caused by a human fist. The doctor could not state whether or not the fractures were caused by a telephone, but he did state that they could have been caused by "falling to a solid surface such as a concrete basement floor or something like that." He stated that death from the massive fracture behind the left ear could have taken anywhere from two to six hours to occur.

Dr. Elston was asked to express his opinion as to whether or not a fall on a telephone could have produced the fracture, to which he indicated in the negative.

Dr. Edward James, the neurosurgeon, stated that he could not say what caused the fracture, but did state that the fall on the telephone could not have caused the fracture.

Dr. Kellum also testified that in his opinion it was "utterly impossible" for the child to have fallen on the telephone and suffered the injuries involved.

Deputy Sheriff Holloway first saw Barbara Best at the emergency room of St. John's McNamara Hospital following Steven Best's admission. He later taped a conversation with defendant in the presence of her attorney, Mort Wilkins, Jr., and the state's attorney in the sheriff's department in the Pennington County Courthouse. This taped recording was transcribed and later read to the jury during the trial. Deputy Sheriff Holloway also went to the Best home and secured a telephone which was introduced as Exhibit 5 during the trial.

The only explanation offered by Mrs. Best was that the child could possibly have fallen on the telephone and also some inference that Timothy might have struck Steven with some

object, although no other object was present except the telephone.

Mary Ann Stancil, a close neighbor, testified in answer to a question as to whether she had ever seen defendant strike Steven:

"Yes. Barbara was changing Steven and he had a bad diaper rash. He was pretty—I would say he was very bad because his skin was peeling off his penis and it was bleeding, so naturally the child would start crying, and Barbara lifted him up and slapped him on the back, and I asked if it wasn't a little too hard to slap a baby like that and she stated that this was how she broke Timothy of crying and that's how she was going to break Steven."

Mrs. Stancil also testified to hearing Steven crying on many occasions, and in one notable instance on November 19, 1972, the Sunday before the baby's death, she heard him crying, heard Mrs. Best yell at him to stop crying, followed by sounds of violence, after which the cries of the child were intensified.

In this appeal the defendant first argues that the trial court erred in allowing the reading into the evidence of the transcript of a statement given by the defendant, and in allowing the testimony of Deputy Sheriff Holloway as to the circumstances of the taking of this statement before proving the corpus delicti.

The almost universal rule is that the admissibility of an extrajudicial confession is conditioned upon its corroboration by other evidence. *Tabor v. United States*, 1945, 4 Cir., 152 F.2d 254; Annot., 127 A.L.R. 1130. The same principle has been applied to incriminating admissions. *Opper v. United States*, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101, 45 A.L.R.2d 1308; however, the cases have differed on the extent of such evidence required.

The majority rule is that the corroborating evidence must show (1) the fact of an injury or loss, and (2) the fact of someone's criminal responsibility for the injury or loss. These two elements have been held to compromise the "corpus delicti" for purposes of the rule requiring such corroboration. *Manning v.*

*United States,* 1954, 10 Cir., 215 F.2d 945; *United States v. Washington,* 1946, D.C.Maryland, 69 F.Supp. 143. Thus, in the instant case, introduction of defendant's incriminating admissions was proper if supported by evidence of the corpus delicti.

The California Supreme Court has recently stated that:

"A prima facie showing of the corpus delicti of the crime charged must be made before a defendant's extrajudicial statements, admissions or confessions may be received in evidence (citations omitted). To establish the corpus delicti in the instant case, it was only necessary for the People to show a reasonable probability the criminal act of another caused the death of [the twelve-year-old victim] (citations omitted). The corpus delicti may be established by circumstantial evidence, and by the reasonable inferences to be drawn from such evidence (citations omitted). While slight evidence is sufficient to establish the corpus delicti, it must be proved entirely independent of and without considering the defendant's extrajudicial statements (citations omitted)." *People v. Cantrell,* 1973, 8 Cal.3d 672, 105 Cal.Rptr. 792, 504 P.2d 1256 at 1260.

Evidence at trial clearly established that Steven Best had died. Furthermore, expert medical testimony presented a picture of death by criminal abuse rather than accident. Thus, the defendant's statement was properly corroborated by independent evidence.

The question remains as to whether the order of proof used constituted reversible error. While some cases have held to the contrary, the better rule is that the order of proof rests in the sound discretion of the trial court.

"The order in which evidence to prove the corpus delicti is to be received is not important and is largely a matter within the discretion of the trial court. If proof in the nature of independent corroborative evidence supports the introduction of a confession, the time of its introduction is not important. It is sufficient if it is forthcoming at some point in the trial." *Adolfson v. United States,*

1947, 9 Cir., 159 F.2d 883 at 888, cert. den. 331 U.S. 818, 67 S.Ct. 1307, 91 L.Ed. 1836.

" 'That the evidence of the "corpus delicti" should be put in *before* a confession is certainly good practice, and is occasionally said to be the rule; but the better view is that the trial judge may determine the order of this evidence, on the general principles otherwise prevailing.' " *Manning v. United States*, 1954, 10 Cir., 215 F.2d 945 at 952, quoting 7 Wigmore on Evidence, § 2073, p. 404.

Even in those jurisdictions which do not concur with the above principle it is generally held that error of the trial court with respect to the order of proof does not constitute reversible error absent a showing of prejudice. *Smith v. State*, 1939, 135 Fla. 835, 186 So. 203.

Defendant next raises the question of the qualifications of Dr. Robert Buss· and Dr. Gregory Jelinek as expert witnesses for certain questions. Dr. Buss testified that he was an orthopedic surgeon licensed to practice in South Dakota, Wisconsin and Michigan. Dr. Buss' specialty, of course, involves the bones and joints of the body. Dr. Jelinek testified that he was a radiologist (a specialist in the use of radiant energy, X rays,) licensed to practice in South Dakota, California and New York. Dr. Buss' expert testimony focused on the bone fracture of Steven Best's left arm. His opinion was that the existence of such a fracture in a four-month-old child was highly unlikely in the absence of child abuse. Dr. Jelinek testified as to the rib, skull and arm fractures suffered by Steven Best. Defendant objects to Dr. Jelinek having testified that he considered it "very unlikely that the amount of twisting force required for this type of fracture (the arm fracture) could occur [if a four-month-old child would stick his arm through the slats in a crib]." Defendant contends that Dr. Buss should not have been allowed to testify on the possible existence of child abuse as he was not qualified in this area. Similarly, defendant alleges that Dr. Jelinek was not qualified to express his opinion on the force necessary to cause such a fracture.

While not distinguished by the state, we believe that the objection to Dr. Buss' testimony is on even weaker ground. This

orthopedic specialist was, in substance, expressing his opinion to the effect that the twisting force necessary to cause such a fracture made it highly unlikely that the force was applied accidentally. This opinion is certainly within the realm of his bone and joint specialty. The references to "child abuse" could better have been phrased in terms of deliberate force, but this failure does not seem prejudicial. Both objections may be disposed of on the following reasoning.

This standard of review was established by the court in *Helgerson v. Riiff,* 1950, 73 S.D. 467, 44 N.W.2d 126:

> " 'A witness is an expert witness and is qualified to give expert testimony if the judge finds that to perceive, know or understand the matter concerning which the witness is to testify, requires special knowledge, skill, experience or training and that the witness has [those requisites].' Restatement Model Code of Evidence, § 402; *Bratt v. Western Air Lines, Inc.,* 10 Cir., 155 F.2d 850, 166 A.L.R. 1061. The qualifications and competency of a witness to give opinion evidence is primarily in the discretion of the trial court and his ruling in determining qualifications will not be disturbed unless there is no evidence that the witness had the qualifications of an expert or the trial court has proceeded upon erroneous legal standards. 20 Am.Jur., Evidence, § 786." 73 S.D. at 475, 44 N.W.2d at 130.

This statement of the rule does not conflict with the practice in most jurisdictions.

> "While the court may rule that a certain subject of inquiry requires that a member of a given profession, as a doctor, an engineer or a chemist, be called, usually a specialist in a particular branch within the profession will not be required. The practice, however, in respect to experts' qualifications has not for the most part crystalized in specific rules, but is recognized as a matter for the trial judge's discretion reviewable only for abuse. Reversals for abuse are rare." McCormick, Evidence, 2d Ed., p. 30.

■ Thus, in order to sustain defendant's challenge it would be necessary to hold that the trial court abused its discretion. The extensive education and experience of Dr. Buss and Dr. Jelinek as physicians and specialists appear in the record. Defendant does not assert that they are not generally qualified as expert medical witnesses, but, in effect, charges that the trial court abused its discretion by allowing them to testify in areas in which they were not competent. To so hold would require trial courts in this state to demand that expert medical witnesses be qualified as specialists in every branch of the profession that is involved in the diagnosis. The great weight of authority holds that such drastic measures are unnecessary, and that, while lack of specialization may affect the weight of the testimony, the trial judge need not find such expert testimony incompetent. *Seawell v. Brame,* 1963, 258 N.C. 666, 129 S.E.2d 283; *Pridgen v. Gibson,* 194 N.C. 289, 139 S.E. 443, 54 A.L.R. 855; *Parker v. Gunther,* 1960, 122 Vt. 68, 164 A.2d 152; *Wolfinger v. Frey,* 1960, 223 Md. 184, 162 A.2d 745.

The defendant also claims error in allowing the testimony of Dr. Buss based upon hospital records which were not in evidence. The problem here is well stated in McCormick, Evidence, 2d Ed., p. 34:

"The majority view, however, is that a question is improper if it calls for the witness' opinion on the basis of reports that are not in evidence or are inadmissible as substantive evidence under the hearsay rule (without reciting their contents as hypotheses, to be supported by other evidence as to their truth). The essential objection seems to be that the jury is asked to accept as evidence the witness' inference, based upon someone's hearsay assertion of a fact which is, presumably, not supported by any evidence at the trial and which therefore the jury has no basis for finding to be true * * Should these objections still prevail when the witness is asked to give a similar direct (not hypothetical) opinion, on the basis not merely of reports of this kind, but of these reports supplemented by the witness' own observation of the person or situation in question? Probably many courts would apply the same reasoning, and exclude the

evidence under a variety of circumstances, but there is a strong trend toward a contrary view."

■ In the present case, the court is faced with a situation of the latter type. Dr. Buss' expert opinion was based on both reports not in evidence and his personal observation and treatment of Steven Best on a number of occasions. We believe that the better view is that expert medical testimony should not be subject to this sort of hearsay objection.

"In order to say that a physician, who has actually used the result of * * * tests in a diagnosis * * * may not testify what that diagnosis was, the court must deliberately shut its eyes to a source of information which is relied on by mankind generally in matters that involve the health and may involve the life of their families and of themselves—a source of information that is essential that the courts should possess in order that it may do justice between these parties litigant.

"In making a diagnosis for treatment, physicians must of necessity consider many things that do not appear in sworn proof on the trial of a lawsuit—things that mean much to the trained eye and touch of a skilled medical practitioner. This court has held that it will not close the doors of the courts to the light which is given by a diagnosis which all the rest of the world accepts and acts upon, even if the diagnosis is in part based upon facts which are not established by the sworn testimony in the case to be true." *Sundquist v. Madison Rys. Co.*, 1928, 197 Wis. 83, 221 N.W. 392 at 393.

■ The primary reason for the allowance of an exception to the hearsay rule is a judicial belief in the essential trustworthiness of certain extrajudicial statements under certain circumstances. For example, "dying declarations" or spontaneous utterances have generally been considered admissible, though hearsay, because human nature is such that these statements may ordinarily be found worthy of belief. A similar character of trustworthiness may be attributed to medical records compiled by X-ray technicians, physicians, nurses, etc., who are engaged in the life

and death business of medicine. However, only the narrow issue need be decided here, i. e., may a physician who has *personally observed and treated* a patient give his expert opinion even though he has relied in part on the work of others? Another telling argument for an answer in the affirmative is the unavoidable fact that expert opinion is indirectly based on hearsay. An expert generally qualifies in large part as an expert as a result of his diligence in studying the work of others. Practical necessity also demands that the physician rely on reports and tests made by others. This court recognized this need for reliance on others in *Mueller v. Mueller,* 1974, 88 S.D. 446, 221 N.W.2d 39:

> "The busy doctor has no alternative but to prescribe these drugs according to the recommendations of the drug manufacturers. No one would expect him to stop his practice and conduct tests and experiments so that he could prescribe the drug solely from his own independent findings. on its usefulness and possible side effects." 221 N.W.2d at 43.

*Mueller* stands for the proposition that a physician may be charged with malpractice for negligent disregard of results of experiments conducted by others, and this points out the physician's need to depend on others, consistent with his professional judgment.

The following authorities support the rule which permits expert opinion testimony even though based, in part, upon reports of others not in evidence but customarily relied upon by the expert in the practice of his profession. Rule 703, Federal Rules of Evidence; *Jenkins v. United States,* 1962, 113 U.S. App. D.C. 300, 307 F.2d 637; *Taylor v. Monongahela Railway Co.,* 1957, D.C.Pa., 155 F.Supp. 601; *Schooler v. State,* 1943, Tex.Civ.App., 175 S.W.2d 664; *Sundquist v. Madison Rys. Co.,* 1928, 197 Wis. 83, 221 N.W. 392.

■ Defendant next argues that certain statements made by the state's attorney in closing argument constituted reversible error. The particular statements objected to in closing argument were the following:

"I'm not saying that she wanted to kill her son. I'm saying she did kill him, though, because she's the only one that could have done it."

"She battered that child."

"That child was battered. Take a look at the photographs and you'll see the child was battered."

"That child was battered from the time he was born to the Bests until he died, and the evidence shows that without a doubt."

"Again, that child was battered."

"Again, it's the State's opinion this child was battered."

"Who battered that child. The parents. Who does most of the battering? Generally the father. But did you notice that he said the statistics said that the most serious injuries are caused by the mother. Now, that was the expert opinion of Dr. Kellum."

"The child was mistreated from the time he was returned to the home and that's what led to the killing."

These expressions by the state's attorney were statements of his opinion as to the guilt of the defendant. In *State v. Johnson,* 1955, 76 S.D. 37, 71 N.W.2d 733, the court held that this comment by counsel for the state, in his *opening* statement, was improper:

> " 'I believe after you hear the testimony there will be no doubt in your minds that he is guilty. If I did not believe that, I would not bring this charge against the man.' " 76 S.D. at 40, 71 N.W.2d at 734.

The trial court admonished the jury to disregard the statement, and, in view of this, this court found that the comment did not prejudice the defendant. An expression of the prosecutor's opinion was at issue in *State v. Wood,* 1957, 77 S.D. 120, 86 N.W.2d 530, and the court distinguished *State v. Johnson* thusly:

"Defendant contends that the deputy state's attorney was guilty of such misconduct as requires reversal. After commenting upon the rule that the burden of proving defendant's guilt was on the State, counsel said to the jury that in his opinion the facts justified the conclusion that accused was 'guilty beyond a reasonable doubt.' This court has expressed itself as to the impropriety of a state's attorney expressing from personal knowledge his opinion as to the guilt of an accused. *State v. Johnson,* 76 S.D. 37, 71 N.W.2d 733. His belief is not evidence in the case. *This is distinguishable from a statement to the jury of a belief based upon the facts in evidence. The state's attorney in other words has the right to argue to the jury that certain testimony in the case convinces him that accused is guilty.* The record does not completely show the connection in which the belief of counsel was expressed, but *seemingly was based upon evidence in the case.* If the statement were not entirely proper, *it clearly was not prejudicial."* (emphasis supplied) 77 S.D. at 124, 86 N.W.2d at 532.

Defendant contends that *State v. Wood* is inapplicable here essentially because counsel did not immediately refer to the evidence in his expression of opinions. This argument is without merit. Since *State v. Wood* has established that such expressions of opinion may be held nonprejudicial to the defendant, it would be unwise for an appellate court to interfere by degrees within such a class where the trial judge is so obviously in a better position to determine possible prejudice.

" 'The trial judge has a peculiar and distinct advantage of the judges of this court in judging upon such questions, because he is not only familiar with the evidence and the atmosphere of the case, as it may be called, but he has heard the entire argument and knows the setting that the language complained of has in connection with the argument on both sides of a case.' " *Peyton v. State,* 1973, Miss., 286 So.2d 817 at 819.

Defendant argues that the trial court erred in allowing the state's attorney, in his closing argument, to suggest to the

jurors that they each lift the phone in the jury room. The phone itself had been properly admitted into evidence, and there was evidence presented at trial to the effect that a twenty-seven-month-old child could not have hurled the phone with sufficient force to cause such brain and skull damage as suffered by Steven Best. For these reasons, there is no merit to defendant's argument that such examination by the jury would constitute an improper experiment. As the Supreme Court of California held in *Higgins v. Los Angeles Gas & Electric Co.*, 1911, 159 Cal. 651, 115 P. 313:

> "It is this fundamental rule which is to govern the use of such exhibits by the jury. *They may use the exhibit according to its nature to aid them in weighing the evidence which has been given* and in reaching a conclusion upon a controverted matter." (emphasis supplied) 115 P. at 315.

Thus, in lifting the phone themselves, the members of the jury would merely be weighing the evidence which had been presented to them, i. e., whether the *nature* of the phone (its size, weight, etc.) was such that a twenty-seven-month-old child could have hurled it with sufficient force to cause such brain and skull damage. The jury would then decide whether to accept or reject the testimony on this question.

The last question presented is whether the trial court erred in allowing testimony to be presented on the "Battered Child Syndrome," and in failing to direct a verdict of acquittal in favor of the defendant for lack of proof of child abuse, and in instructing the jury on child abuse.

The only real question presented here is the sufficiency of the evidence supporting the convictions. As conceded by Barbara Best's counsel, resolution of this issue against defendant is demanded if the "Battered Child Syndrome" may be accepted as an established medical diagnosis.

 Initially, it should be noted that where it is claimed that the evidence is insufficient to justify the verdict, this court will accept "that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict."

*State v. Zobel,* 1965, 81 S.D. 260, 263, 134 N.W.2d 101, 102; *State v. Geelan,* 1963, 80 S.D. 135, 120 N.W.2d 533. It is axiomatic that the elements of a crime may be proven by circumstantial evidence. The state, of course, is never relieved of its burden of proving defendant's guilt beyond a reasonable doubt. Where the elements .of a crime are to be proven circumstantially, the burden itself does not change although courts have perhaps expressed a greater concern that it be properly discharged.

> "Circumstantial evidence may be equal in value to and sometimes more reliable than direct evidence. However, where circumstantial evidence alone is relied on as to any one or more of the essential elements the circumstance or circumstances must be entirely consistent with defendant's guilt and wholly inconsistent with any rational hypothesis of defendant's innocence and so convincing as to exclude a reasonable doubt that defendant was guilty of the offense charged." *State v. Stamper,* 1972, Iowa, 195 N.W.2d 110 at 111.

While the manslaughter conviction (SDCL 22-16-20) of the defendant here largely rests on circumstantial evidence of a history of child abuse, this is not fatal to the state's case. Indeed, direct evidence is rare in these cases. Assuming that the testimony of the "Battered Child Syndrome" is accepted as competent medical testimony, the next step clearly follows, i. e., that the evidence in this case is legally sufficient so as to empower the jury to exclude a reasonable doubt that defendant was guilty of the crime as charged.

Testimony concerning the "Battered Child Syndrome" was had in this case. While it is true that medical development of this diagnosis is relatively recent, we have found no case in which expert medical testimony on the "Battered Child Syndrome" was rejected. Its use was well explained in the recent case of *People v. Jackson,* 1971, 18 Cal.App.3d 504, 95 Cal.Rptr. 919:

> In other words, the 'battered child syndrome' simply indicates that a child found with the type of injuries outlined above has not suffered those injuries by accidental

means. This conclusion is based upon an extensive study of the subject by medical science. The additional finding that the injuries were probably occasioned by someone who is ostensibly caring for the child is simply a conclusion based upon logic and reason." 95 Cal. Rptr. at 921.

Thus, the court concluded that the province of the jury was not invaded through medical testimony on the "Battered Child Syndrome." The court also observed that this diagnosis has long been recognized at the trial court level, and detailed the criteria used in the diagnosis:

"There are several elements that are the criteria for the 'battered child syndrome.' They are (1) the child is usually under three years of age; (2) there is evidence of bone injury at ·different times; (3) there are subdural hematomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect." 95· Cal. Rptr. at 921.

These same elements are present in the case of Steven Best, as testified to by Dr. Kellum and other doctors in both cases. Another case permitting medical testimony relating to the "Battered Child Syndrome" is State v. Loss, 1973, 295 Minn. 271, 204 N.W.2d 404. Defendant attempts to distinguish that case from the instant case by arguing that the pediatrician's testimony also touched on a profile of a "battering parent" while there is no such testimony here. Actually, there was testimony here by Mrs. Stancil from which the jury could find that there was a battering parent. Further, a careful reading of the Minnesota case does not support the proposition that testimony on the "Battered Child Syndrome" must fall where unaccompanied by a profile of the battering parent. Also see People v. Henson, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358.

The legislature, since the enactment of Ch. 90, S.L.1964, later amended by Ch. 172, S.L.1973, and further amended by Ch. 179, S.L.1975, now codified as SDCL 26-10-10 through 26-10-12.3, although not using the terminology "Battered Child

Syndrome," clearly has recognized the symptoms present in such cases. Thus the law requires persons in the medical field as well as law enforcement officers to report an abuse of a minor child who "has had serious physical injury or injuries inflicted upon him by abuse or willful neglect other than by accidental means * * *." SDCL 26-10-10. It was in response to these laws, subjecting them to penalty for failure to report, that the doctors who had had the care and treatment of Steven Best brought to the attention of the district county court the facts of the abuse of this child and which occasioned the temporary removal of Steven Best from parental custody.

We conclude that the trial court did not commit prejudicial error in any of its rulings as to this defendant, and the conviction is affirmed.

All the Justices concur.