**UNITED STATES**

v.

**Senior Airman Gloria A. IRVIN, FR 262–11–9690, United States Air Force.**

**ACM 23269.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 21 Dec. 1981.

Decided 14 May 1982.

Appellate Counsel for the Accused: Colonel George R. Stevens and Major Alexander S. Nicholas.

Appellate Counsel for the United States: Colonel James P. Porter, Major George D. Cato and Lieutenant Colonel William H. Seckinger, USAFR.

Before MILES, KASTL AND RAICHLE, Appellate Military Judges.

## DECISION

MILES, Senior Judge:

Contrary to her pleas, the accused was convicted by general court-martial of involuntary manslaughter,[1] assault and battery on a child under the age of 16 and child abuse,[2] in violation of Articles 119, 128 and 134 of the Uniform Code of Military Justice [hereinafter U.C.M.J.], 10 U.S.C. §§ 919, 928, 934. The approved sentence extends to a dishonorable discharge, confinement at hard labor for four years, forfeiture of $334.00 per month for four years and reduction to airman basic.

## I. FACTS

Margaret Cox, the decedent, was born on 9 November 1977 and died on 14 December 1979. On 18 October 1979, the Denver Department of Social Services placed her for adoption in the home of Sergeant Charles Irvin and his wife, the accused, who resided on Lowry Air Force Base, Colorado. The evidence established that Margaret Cox was a normal, healthy, happy infant with no particular health or development problems.

During various conversations from 18 October 1979 to 12 December 1979, the accused told a Denver social services worker that she was having problems toilet training Margaret. During this same period, Mrs. Sheila Gray, a baby sitter, who regularly took care of Margaret during the day, noticed various bruises on her especially a black eye, a bruise above the navel, and a bruise on her right ear. Other persons who saw Margaret during this period observed bruises and marks on her. However, by 12 December these bruises had healed except for a bruise on the left eyebrow. On 11 December 1979, the child complained of a headache to Mrs. Gray, but on the next day she seemed to be fine.

At approximately 1630 hours on 12 December, the accused picked up Margaret from the babysitter. At that time, she was normal, unbruised (except as noted) and uninjured. Shortly before 1800 hours, the accused, with Margaret in her arms, returned to Mrs. Gray's quarters and told her husband, Sergeant Gray, that Margaret was very sick and had choked on something while eating. Sergeant Gray noticed that the child was limp, breathed erratically, appeared unconscious and had a fresh bruise on her collar bone and splotches on her face. The accused left Margaret with Sergeant Gray, returned to her quarters briefly, and then drove Margaret to the Lowry Air Force Base clinic at the suggestion of Sergeant Gray.

At approximately 1805 hours, the accused arrived at the Air Force clinic. Upon arrival, Margaret was unconscious, her eyes were fixed and her pupils were dilated and she was in respiratory distress. She had extensive bruises on her body including some on the left shoulder area, on the right thigh, above the left eyebrow, and lacerations on her lips; and there was blood in her mouth and throat which had to be suctioned out. On the back of her head at the

---

1. She was charged with unpremeditated murder but convicted of the lesser included offense of involuntary manslaughter as a result of assault and battery.

2. This was tried as a violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, as a noncapital federal offense, pursuant to 18 U.S.C. § 13 (1976), Assimilative Crimes Act, incorporating Section 18–6–401, Colorado Revised Statutes, 1973, as amended.

occipital region of the skull, there was a massive subdural hematoma—a large fluid-filled bruise. Her blood pressure was unreadable and pulse shallow.

After five minutes, the medical technicians determined that Margaret's condition was critical and required immediate hospitalization and extensive medical treatment. She was taken to a nearby civilian hospital by ambulance, arriving at approximately 1820 hours. Upon arrival, Margaret remained unconscious, had an abnormal respiratory pattern, and dilated pupils. She did not respond to any stimulus. Various bruises and contusions were noted on her body including her forehead, both eyes, left shoulder, right thigh and left leg and above her pubic area.

Later that evening, Margaret was transferred to another civilian hospital due to the availability of a Computerized Axial Tomography (CAT) scanner, to determine the exact nature of injuries to her head. After two days and despite extensive treatment, Margaret's condition continued to deteriorate. The initial neurological examination revealed no brain stem function and only minimal spinal cord reflexes. Eventually, even those reflexes disappeared. On 14 December 1979, Margaret's respirator was disconnected due to brain death and she was declared dead.

The medical evidence in this case was extensive. Fourteen physicians testified for the prosecution. Nine of these had treated and examined Margaret. They included two neurological surgeons, a pediatric neurologist, a board-certified specialist in emergency medicine, and several certified pediatricians. Additionally, two pathologists testified for the prosecution, one of whom performed the autopsy on Margaret Cox. Other evidence supported the prosecution's case including the testimony of various nurses and medical technicians and extensive documentary evidence. The latter included numerous photographs of the decedent taken around 1930 hours on 12 December, in the early morning of 13 December and at the autopsy. Other evidence was taken from the accused's quarters and a videotape of the quarters was admitted at trial.

All of this evidence—overwhelming and massive as it is—established clearly that Margaret Cox received the highest degree of professional medical care and treatment from the time she was initially taken to the Lowry clinic to the time of her death. Contrary to defense claims at trial, it also established that she had extensive bruises and contusions over her body at the inception of this medical treatment. These bruises included a series of five, on the forehead, extensive bruises over most of the right thigh, a massive bruise over the occipital portion of the skull, bruises on the left shoulder and the right lower leg, and above the pubic area. Although this was not the complete extent of the bruises, other bruises could not be conclusively established as predating her medical treatment.

The autopsy established the cause of death as severe brain injuries caused by massive hemorrhaging and a skull fracture of the occipital portion. Because of protection from adjoining muscle tissue, a strong force is required to fracture this part of the skull. A CAT Scan X-ray also confirmed the skull fracture. It was clearly and convincingly established that these head injuries also preceded any medical treatment given to Margaret.

At the trial, the accused did not testify. However, numerous statements that she made as to the cause of Margaret's injuries to medical personnel and others were admitted into evidence. Although varying in detail, essentially the accused claimed that Margaret had been eating in the kitchen while sitting in a booster-chair and the accused was out of the room. After she heard a crash, the accused rushed back to the kitchen and Margaret had apparently fallen out of the booster chair. Margaret allegedly was standing after the fall, then later vomited and became unconscious. These statements varied in detail and conflicted with her claim to Sergeant Gray that Margaret's breathing difficulties occurred when she choked while eating.

## II. CONCLUSIONS ON EVIDENCE

■ All of this evidence, including the testimony of the physicians presented by the prosecution, established that Margaret's injuries—because of their type, location and nature—could not have resulted from accidental causes. For example, the injuries to Margaret's head could only have resulted from repeated trauma to the head and could not have resulted from a single fall of three or four feet. Other medical indications, such as retinal hemorrhaging and retinal detachment observed by several of her treating physicians, were strong indicators of nonaccidental causation.

In their testimony, several physicians testified that Margaret's injuries were consistent with a diagnosis of repeated nonaccidental trauma to a child by persons having custody or control over her. Their answers were phrased in this manner, at the military judge's request, to insure their testimony did not usurp any jury functions in deciding the case.

We conclude that the evidence at trial established beyond a reasonable doubt the nonaccidental nature of the injuries and death suffered by Margaret Cox at the hands of the accused. Supporting this conclusion is the medical evidence previously mentioned as well as other circumstantial evidence. This included admissions the accused made that she had disciplined the child with a comb, her statements concerning the difficulty of potty training Margaret and the detailed evidence concerning the search of accused's quarters conducted after Margaret's admission to the hospital, particularly the fact that the kitchen was undisturbed and clean. Her guilt was compellingly established because the victim was in the accused's exclusive custody during a brief hour and one half period; no one else was shown to have been in the child's presence during the time;[3] and the victim's injuries and death were not accidentally caused and could not have occurred in the manner suggested in the accused's pretrial statements.

## III. BATTERED CHILD SYNDROME

In their initial assignment of error, appellate defense counsel assert the military judge erred by permitting physicians' testimony amounting to ultimate legal conclusions under the guise of medical diagnosis and that no proper foundation was laid for such evidence. We find no merit in either claim.

The applicable Military Rules of Evidence recognize that if scientific, technical or other specialized knowledge will assist the trier of fact in understanding the evidence or determining issues, then an expert may testify in the form of an opinion or otherwise concerning that specialized knowledge. Mil.R.Evid. 702. Mil.R.Evid. 704 specifically provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Contrary to defense claims, the "battered child syndrome" is a recognized medical diagnosis.[4] For over a decade, trial courts have recognized the battered child syndrome as a legally qualified diagnosis. *People v. Jackson*, 18 Cal.App.3d 504, at 507–8, 95 Cal.Rptr. 919, 921 (4th Dist.Ct.App.1971). *Accord: Landeros v. Flood*, 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (1976).

In *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978), the Supreme Court of North Carolina recognized the admissibility of expert testimony about the battered

---

3. The evidence at trial established that the accused's husband was *not* in the quarters during the period from 1600 to 1650 hours and from approximately 1710 hours to well after the child was taken to the Lowry AFB clinic. There is some evidence to suggest the accused's husband might have been in the quarters for a brief period from 1650 to 1710 hours to change clothes.

4. Plaine, "Evidentiary Problems in Criminal Child Abuse Prosecutions," 63 Geo.L.J. 257, 272 (1974); Brown, Fox and Hubbard, "Medical and Legal Aspects of Battered Child Syndrome," 50 Chi.-Kent L.Rev. 45 (1973); McCoid, "The Battered Child and Other Assaults on the Family," Part One, 50 Minn.L. Rev. 1, 3–19 (1965).

child syndrome and its application to particular facts. The test for the admissibility of such opinion evidence is whether the "opinion required expert skill or knowledge in the medical or pathologic field about which a person of ordinary experience would not be capable of satisfactory conclusions, unaided from expert information by one learned in the medical profession." *State v. Wilkerson, supra*, 247 S.E.2d at 911.

Other courts have similarly upheld the admission of expert medical testimony describing the battered child syndrome and relating it to the injuries in a particular case. *See State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973); *State v. Best*, 89 S.D. 227, 232 N.W.2d 447 (1975); *People v. Henson*, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (1973). Annot., 98 A.L.R.3d 306 (1980); *See also*, Annot., 97 A.L.R.3d 338 (1980).

■ The opinion testimony in this case was well within the bounds of admissibility. The testimony about the "battered child syndrome" was not the central feature of any testimony; rather, the case centered directly on the injuries and proof they could not have resulted from accidental trauma. We find the testimony of the physicians, as expert witnesses, was of considerable assistance to the fact finders in view of the highly technical nature of this medical evidence. It did not in any way usurp the function of the members in ultimately deciding both the cause of the injuries and the accused's criminal responsibility therefor. Such testimony was clearly admissible under Mil.R.Evid. 702 and 704.

■ Contrary to further claims of appellate defense counsel, none of the physicians testified that the accused caused Margaret's injuries and death. Their evidence only established without any question the nonaccidental nature of the injuries. The ac-

cused's guilt was established from the compelling evidence placing Margaret in her custody during the one and one half hours that these injuries were inflicted.[5]

■ We also reject the related defense objection to the reliance by some of the expert witnesses on various learned and scholarly articles on child abuse and injuries to children from falls. Mil.R.Evid. 803(18).

## IV.  ASSIMILATIVE CRIMES ACT

Appellate defense counsel assert several errors relating to accused's conviction under 18 U.S.C. § 13 (Assimilative Crimes Act) for child abuse. They claim: (a) the prosecution failed to establish federal criminal jurisdiction; (b) the child abuse offense is preempted by other Articles of the U.C. M.J.; (c) the military judge erred in admitting into evidence a copy of the Colorado child abuse statute; and (d) the maximum punishment should have been less than sixteen years. We disagree with the first two assigned errors, but agree with the last two in part.

Appellate defense counsel claims now that the prosecution did not prove federal criminal jurisdiction over Lowry Air Force Base, Colorado, at trial. We disagree.

The Assimilative Crimes Act, 18 U.S.C. § 13 (1976) applies only to areas of exclusive or concurrent federal criminal jurisdiction. Manual for Courts-Martial, 1969 (Rev.), paragraph 213e (2). The need to establish such jurisdiction is well recognized. *United States v. Perry*, 12 M.J. 112 (C.M.A. 1981). This is frequently done by stipulation or judicial notice. *United States v. Rowe*, 13 U.S.C.M.A. 302, 32 C.M.R. 302 (1962); *United States v. Perry, supra*. *See also* Air Force Pamphlet 110–3, Civil Law, paragraph 15–5, 17 May 1976.

At trial, the military judge did not *specifically* take judicial notice of Lowry Air

---

5.  As the California Court of Appeals noted: "In other words, the 'battered child syndrome' simply indicates that a child found with the type of injuries outlined above has not suffered those injuries by accidental means. This conclusion is based upon an extensive study of the subject by medical science. The additional finding that the injuries were probably occasioned by someone who is ostensibly caring for the child is simply a conclusion based upon logic and reason. *People v. Jackson*, 95 Cal.Rptr. 919, at 921. (Ct.App. 4th Cir. 1971) *Accord. State v. Wilkerson, supra*.

Force Base as an area of exclusive federal jurisdiction—nor was he asked to do so. In responding to defense's argument on appeal, appellate Government counsel now ask us to take judicial notice of this fact.[6] We decline to do so, finding it unnecessary.[7]

■ At trial, the participants fully recognized the exclusive federal criminal jurisdiction over the situs of the offenses on Lowry Air Force Base; by implication, judicial notice was taken.[8] In fact, the trial defense counsel specifically conceded that the state of Colorado was without jurisdiction to try the offenses charged. Having conceded the specific applicability of the Assimilative Crimes Act at trial, the defense cannot now claim for the first time on appeal the reverse of that position. The assignment of error is without merit. *See United States v. Piggie,* 622 F.2d 486 (10th Cir. 1980), *cert. denied,* 449 U.S. 863, 101 S.Ct. 169, 66 L.Ed.2d 80 (1980); *United States v. Lavender,* 602 F.2d 639 (4th Cir. 1979); *Canal Zone v. Burjan,* 596 F.2d 690 (5th Cir. 1979); *United States v. Hughes,* 542 F.2d 246 (5th Cir. 1976).

■ On a related issue, appellate defense counsel urge that the military judge erred by denying a defense motion to dismiss the child abuse offense because of its preemption by other Articles of the U.C.M.J. We disagree. In our view, Congress did not intend to limit prosecution of child abuse offenses to assaults under Article 128, U.C.M.J., and the charged offense is not a residuum of elements of a specified offense. *United States v. Wright,* 5 M.J. 106 (C.M.A. 1978); *United States v. Norris,* 2 U.S.C. M.A. 236, 8 C.M.R. 36 (1953). *See United States v. Brown,* 608 F.2d 551 (5th Cir. 1979).

■ Appellate defense counsel claim that the military judge erred by admitting into evidence a copy of the Colorado child abuse statute. We agree. The statute did contain irrelevant and possibly misleading matter. The reasons prompting its admission would have been better served by a more explicit acknowledgment, through judicial notice, of the exclusive federal criminal jurisdiction over Lowry Air Force Base and the relevancy of the Assimilative Crimes Act.[9] Moreover, the military judge is the sole source of the law and reference by the members to outside sources, even as evidence, is prohibited. *See, United States v. Boswell,* 8 U.S.C.M.A. 145, 23 C.M.R. 369 (1957); *United States v. Rinehart,* 8 U.S.C. M.A. 402, 24 C.M.R. 212 (1957). Yet, we are convinced beyond a reasonable doubt the error was harmless and had no impact on the findings in view of the compelling evidence of guilt. Any impact on sentence has been considered in our reassessment.

■ We also agree with the appellate defense counsel's claim that the maximum period of confinement should have been less than sixteen years. The maximum punishment for child abuse in Colorado is normally one year, but if serious bodily injury results, the punishment can be eight years. *See* Colorado Revised Statutes §§ 18–6–401(7); 18–1–105; 18–1–106. The military judge ruled correctly when he found the Colorado law supplied the maximum. *See* 18 U.S.C. § 13 (1976); *United States v. Picotte,* 12 U.S.C.M.A. 196, 30 C.M.R. 196 (1961). Yet, he went too far in attempting to use a theoretical possibility of doubling the maximum under Colorado law to justify a sixteen year maximum. This conclusion is supported by the inherent complexity of the Colorado statute requiring procedures which could not be followed by courts-mar-

---

**6.** The Government's REPLY BRIEF, dated 12 March 1982.

**7.** The Military Rules of Evidence, like the Federal Rules of Evidence, recognize the possibility of judicial notice on appeal. Mil.R.Evid. 201(f). However, federal courts in criminal cases show great reluctance to do so if the result is to establish an element of an offense not proved below. *See Garner v. Louisiana,* 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); *United*

States v. Bliss, 642 F.2d 390 (10th Cir. 1981); *United States v. Jones,* 580 F.2d 219 (6th Cir. 1978); *United States v. Burroughs,* 564 F.2d 1111 (4th Cir. 1977). Annot., 49 A.L.R.Fed. 911 (1980).

**8.** Appellate Exhibits XII and XIII.

**9.** *Supra* Note 7.

tial; the fact that the "aggravating circumstances" were an element of the multiplicious manslaughter offense; and the need to strictly construe penal provisions.[10] As the Supreme Court of the United States has recognized, the Assimilative Crimes Act is a method of punishing a crime committed on a federal reservation "only in the way *and to the extent* that it would have been punishable if the territory embraced by the reservation remained subject to the jurisdiction of the state." [Emphasis added]. *United States v. Press Publishing Co.*, 119 U.S. 1, 10, 31 S.Ct. 212, 214, 55 L.Ed. 65 (1911). *See United States v. Dunn*, 545 F.2d 1281 (10th Cir. 1976). We will cure this error by reassessing the sentence.

## V. REMAINING ERRORS

■ We have considered the remaining assignments of error by appellate defense counsel, as well as those specified by the accused in two separate requests for appellate representation, and have resolved them adversely to the accused.[11] One of these issues concerned the prosecution's inadvertent failure to disclose an oral statement by some unknown person at Margaret's funeral.[12] Having read the record of trial, we are absolutely convinced this material did not create a reasonable doubt as to accused's guilt and was of no material significance in view of the compelling evidence thereof. *See United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1977); *United States v. Horsey*, 6 M.J. 112 (C.M.A.1979).

Reassessing the sentence in light of the modified maximum punishment and the entire record, we find appropriate only so much of the sentence as provides for a dishonorable discharge, confinement at hard labor for three years, forfeiture of $334.00

per month for four years and reduction to airman basic.

The findings of guilty and the sentence as modified are

AFFIRMED.

RAICHLE, Judge, concurs.

KASTL, Judge, dissenting:

I approve the disposition of issues in the well-reasoned majority opinion. However, I would remand for a new trial based upon another assignment of error, not addressed therein.

Following trial, the convening authority ordered a limited hearing under *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967) concerning a potentially inculpatory statement overheard at the deceased child's funeral. During the hearing, Dr. Pamela McBog testified that she had heard an unknown black man at the funeral utter "Oh, my God, I killed her, I killed her" or similar words. The military judge found that: (a) Dr. McBog had advised the prosecution of this matter prior to the accused's trial; (b) the prosecution did not disclose the statement to the defense prior to trial; and (c) the nondisclosure was not due to any intentional self serving or malicious reason.

### Constitutional Due Process

The United States Supreme Court has considered whether prosecution suppression of evidence favorable to an accused violates due process in *United States v. Augurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Without elaborating on the nuances of a complex subject, the relevant portions of *Brady* and *Augurs* counsel that:

**10.** *See United States v. Guilbault*, 6 M.J. 20 (C.M.A.1978); *United States v. Baker*, 18 U.S.C.M.A. 504, 40 C.M.R. 216 (1969).

**11.** Appellate Defense Counsel's MOTION FOR LEAVE TO FILE DOCUMENT (Revised Air Force Form 304, dated 29 December 1981), SUPPLEMENTAL ASSIGNMENT OF ERROR, AND ADDITIONAL CITATION OF AUTHORITY, dated 24 March 1982, is granted.

**12.** As told to the prosecutor before trial, the witness heard an unknown voice at the close of the funeral say "Oh my God, I killed her." The witness did not know or even see who made the statement, could not identify who was near the area where the sound came from, and could not even positively identify the gender of the voice. Efforts by the prosecution to discover more about this failed. The evidence at the subsequent hearing suggests the accused was well aware of anything said.

(1) If the suppressed evidence is material, it matters not that the prosecution acted in good faith.[1]

(2) The question of whether a given piece of evidence is material can be relevant as to findings, sentence, or both.[2]

(3) Sometimes, evidence is obviously of such substantial value to the defense that elementary fairness requires disclosure—even without specific request. In determining whether prosecution *suppression* of evidence results in constitutional error, the accused should not have to satisfy the same severe burden he carries in a motion for a new trial—i.e., that newly discovered evidence probably would have resulted in an acquittal.[3]

(4) The proper standard is this: If the omitted evidence creates a reasonable doubt that did not otherwise exist, "constitutional error has been committed."[4]

Courts have applied these difficult concepts with varying results. See, for example, *Stokes v. State*, Del., 402 A.2d 376, 379–381 (1979) (particularly excellent analysis of cases); *People v. Torez*, 90 Mich.App. 120, 282 N.W.2d 252 (1979); and *Jackson v. Wainwright*, 390 F.2d 288, 294–297 (5th Cir. 1968). *See generally*, Annot., 34 ALR3d 16 (1970). The Court of Military Appeals has applied *Brady* and *Agurs* in *United States v. Horsey*, 6 M.J. 112 (C.M.A.1979). The Court suggests that the proper reading of the *Brady* and *Agurs* test is:

> The evidence must be highly probative of the innocence of the accused in more than an isolated way.

*United States v. Horsey, supra*, at 115.

### Military Discovery

Over and above the constitutional due process issue, there is an additional consideration—the unusually liberal discovery practices enshrined in military law. Thus, military practice well may require a standard more forthcoming than *Brady* and *Agurs*. Information available to a military accused normally exceeds that obtained by defendants in almost all state and federal courts. H. Moyer, Justice and the Military 437 (1972). *See also United States v. Brakefield*, 43 C.M.R. 828, 833 (A.C.M.R. 1971). Summarizing, Moyer comments that:

> As a matter of practice, discovery in courts-martial is generally open-ended and informal, and material is often furnished even though not specifically required under the [Manual for Courts-Martial] .... Moyer, *supra*, at 444.

Apropos of this standard, paragraph 44g, Manual for Courts-Martial, 1969 (Rev.), sets forth duties of the trial counsel during the trial. The paragraph addresses the prosecutor's role thus:

> Although his primary duty is to prosecute, any act, such as the conscious suppression of evidence favorable to the defense, inconsistent with a genuine desire to have the whole truth revealed, is prohibited.

*See United States v. Croft*, 33 C.M.R. 856, 860 (A.F.B.R.1963). *See generally*, DA Pam 27–173, Military Justice—Trial Procedure, paragraph 19–14, April 1971. (Disclosure "should be construed liberally within the spirit of ethical standards.")[5]

### Conclusion

This case has taken on a new slant with the matters presented at the *DuBay* hear-

---

1. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

2. *Brady v. Maryland, supra*, at 88, 90–91, 83 S.Ct. at 1197, 1198.

3. *United States v. Agurs*, 427 U.S. 97, 110–111, 96 S.Ct. 2392, 2400–2401, 49 L.Ed.2d 342 (1976).

4. *Agurs, supra*, at 112–113, 96 S.Ct. at 2401–2402, see also Fn. 22.

5. Overlaying both the constitutional and military discovery aspects of the problem is the matter of ethical standards. The prosecutor must reveal evidence tending to negate the guilt of the accused, or mitigate the degree of the offense, or reduce the punishment. *See* Disciplinary Rule 7–102(b); *see generally*, *Spilker*, The Ethical Charge to Counsel, 22 Air Force L.Rev. 101, 112–113 (1980–1981).

ing. As I understand their position, the defense claims:

a. the prosecution learned of a potentially inculpatory statement at the deceased's funeral which amounted to someone else "confessing" to the crime;

b. the prosecution failed to inform the defense of this;

c. the defense thus never had a chance to explore the inculpating statement [6]; and

d. this situation is squarely within the Supreme Court's comment in *Agurs* that "there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed...." *United States v. Agurs, supra*, 427 U.S. at 110, 96 S.Ct. at 2400.

In my judgment, this factual situation comes tantalizingly close to meeting the *Brady-Agurs* test.[7] Even if the facts technically do not meet that threshold, the liberal procedures of military discovery nonetheless mandate a new trial since the accused was denied the broad and traditional discovery routinely recognized in the military. See DA Pam 27-173, Military Justice—Trial Procedure paragraph 19-14, April 1971.

On this basis I would remand for a new trial.

---

6. One cannot easily say that both sides had "equal access" to the witness on this matter—she was expected to testify solely as a medical expert; only a psychic "hunch" could have led the defense to ask whether she had attended her patient's funeral and overheard exculpatory matters of possible value to the accused.

7. During the entire trial for example, the accused's husband, also an airman, claimed his rights under Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. His alibi for the timeframe in question is not airtight and there is some suggestion he may have been present in the quarters at a time near the child's death, changing clothes before beginning his outside job as a janitor. Granting the accused the benefit of all inferences, the suppressed evidence creates in my mind a reasonable doubt on the issues of guilt and sentence—particularly as to the degree of the accused's culpability as being solely responsible for death, child abuse, and the other assaults.