## STATE v. DANIEL ALAN LOSS.

204 N. W. 2d 404.

February 2, 1973—No. 43421.

272

*Rerat, Crill, Foley & Boursier, Patrick J. Foley, Sands & Falvey,* and *William E. Falvey,* for appellant.

*Warren Spannaus,* Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Otis, Peterson, and Todd, JJ.

TODD, JUSTICE.

Defendant appeals from the judgment and from the denial of his motion for a judgment of acquittal notwithstanding the ver-

dict, or, alternatively, for a new trial following his conviction for manslaughter in the first degree, Minn. St. 609.20. Defendant contends that the circumstantial evidence in this case, including the use of medical testimony regarding the "battered child syndrome" and the "battering parent syndrome," does not form a complete chain leading directly to his guilt beyond a reasonable doubt and that it was improper to receive evidence regarding the syndromes. We affirm.

Defendant was the father of Lance Running, the deceased minor child of the age of 6 months. The mother was Lynn Marie Running. The parents had dated for several years and had broken up in the late fall of 1969, subsequent to which the mother discovered she was pregnant and bore the infant victim. Defendant was adjudicated the father, began seeing the mother again, and moved into her apartment in February of 1971, the parties contemplating being married the ensuing summer.

Defendant was employed part time, and on the morning of Saturday, March 13, 1971, arose early and left for his place of employment, returning to the apartment shortly before noon. The mother was contemplating doing the laundry and in preparation had stripped the baby's crib. Normally, the couple took the child with them to a laundromat to do the laundry, but the child had been suffering from a serious cold for about a week, so the mother decided to leave him at home and the defendant was to care for the child. The deceased had been treated by Dr. William Watson, the family doctor, on Wednesday of that week for the cold and also for a foot infection caused by a bite by a puppy belonging to the parties. The doctor testified that when he examined the child on Wednesday, other than suffering from the cold and the apparent infection, the child was in good health and there was no indication of any trauma.

On the day of the tragedy the mother had left the apartment about noon, having placed the child in a twin bed of Hollywood-type construction. She had placed a blanket over it and had propped the mattress up with pillows so that the baby could not

roll off the bed. The bed was approximately 2 feet high from the floor. Defendant testified that the baby was sleeping on the bed when the mother left and that he turned on the TV for a while and then proceeded to straighten up the apartment and stack the dishes in the kitchen. He testified he shut off the TV and then stopped to check the baby. He noticed that the baby was not on the bed but was on the floor at the end of the bed. It looked as if the baby had "crawled off the end or squirmed or something." He testified that the baby was on the floor and there was a rug near the bed and a red blanket with the corner hanging down and a brown blanket on the floor just directly beneath the bed. He further testified that he picked the baby up and that the baby seemed tense and started to cry softly for a few minutes; that he gave him a pacifier; and that he put him to sleep in the crib.

Following this incident, defendant continued straightening the apartment when he claimed the mother called and asked how the baby was. He testified he told her about the baby falling off the bed and going back to sleep. The call from the mother was followed by a telephone call in which the caller did not indicate who was calling. The mother had been receiving similar calls apparently from a former boy friend, and she testified that these had angered the defendant. Defendant testified that after the second phone call the dog started barking, whereupon the baby awoke and began to cry. Defendant allegedly attempted to give the baby a bottle but it did not seem to want it. The baby then went back to sleep, so defendant proceeded to do the dishes. Defendant testified that he did not hear the baby breathing, and when he went in to check, the baby was lying there with his hand up in the air and that he, defendant, became scared and grabbed the baby and could barely hear his heartbeat. Defendant then proceeded to give the baby mouth-to-mouth resuscitation and splashed cold water on its face with his fingers. He called the telephone operator and asked for emergency help. The baby was taken by the emergency vehicle to St. Paul Ramsey Hospital and

was admitted to the emergency room, and defendant called the mother at her parents' home and met her at the hospital.

At the hospital, defendant related the story to the mother, except the mother indicated in her testimony that defendant told her that, when he found the baby on the floor, it was lying on a blanket. The hospital report simply indicated that the child may have fallen out of bed.

Later in the evening, X-rays were taken which disclosed a skull fracture and a broken leg, and a doctor contacted both parents and advised them that the medical history did not correspond with the objective findings of the X-rays. At this time, Dr. Homer D. Venters, a pediatrician, was contacted by telephone and advised as to the circumstances. A spinal cut was authorized, disclosing blood and indicating hemorrhaging. On the following morning, Dr. Venters examined the child and noted that a bruise on the baby's forehead had increased in size from the time of the admission of the child, indicating it was of recent origin. The child was pronounced dead at noon on Sunday, March 14.

The mother and father had returned to the apartment just prior to the death of the infant, where the father showed the mother what he claimed had happened. On the day following the death, defendant was contacted at the apartment by Carolen F. Bailey, a police officer, who advised defendant of his rights and indicated that she was investigating the death of the child. Officer Bailey testified that defendant told her that when he found the baby on the floor, he was wrapped in a blanket and was lying on another blanket on the floor and was playing with the blankets. Defendant denied that he ever told this to the police officer.

Defendant also told the police officer that about a week before, while shopping at Har Mar Shopping Center, he had been left in charge of the baby and had had a coke at a drug store with a friend of his. He told the officer that at that time the baby had gotten something in its eyes. He took the baby out to the car on that occasion, wrapped it in a blanket, and placed it in the back

seat, and when he returned home he explained to the mother that the baby's eyes were red because it had gotten some pepper in them. He subsequently indicated to the mother that the baby had bumped its head on the steering wheel, and on cross-examination he claimed that the bumping of the head on the steering wheel and the pepper incident were two separate incidents. Regarding this incident, the mother testified that she had noticed the reddening of the eyes when she arrived home and that a small bruise by the eye appeared the next day but disappeared quickly.

The mother testified that defendant had a temper; that the crying of the baby annoyed him; that the telephone calls had caused him to lose his temper; and that on one occasion he had thrown her about the apartment when he had lost his temper.

On Thursday, following the death of the baby, defendant was to see Officer Bailey again, but did not keep the appointment. Instead, he went to Owatonna where he contacted a relative and called the mother, saying that he had written a note explaining many things and that he was contemplating suicide. Defendant was arrested in Owatonna, and a grand jury returned an indictment containing counts of third-degree murder, Minn. St. 609.195, and first-degree manslaughter, Minn. St. 609.20, against defendant. Following the trial, the conviction of first-degree manslaughter was returned by the jury.

The prosecution introduced through Dr. Wayne H. Schrader, a pathologist, the results of an autopsy performed on the decedent. Dr. Schrader testified that the examination consisted of an external examination of the body, as well as a pathological examination of the organs of the abdomen, thoracic cavity, and skull. He testified that there were bruises over the head and neck area; there was a tannish-colored bruise measuring about a half inch in the midline center of the forehead; there was a purplish-tan bruise measuring nearly 1½ by 3 inches on the left frontal parietal area, which would be just above the ear; a small linear or long rod-shaped bruise about 1 by 2½ inches along the

angle of the right jawbone. There were other marks on the body indicating the medical treatment rendered the child.

Dr. Schrader testified that the color of the bruises indicated that they were probably not more than 1 to 2 days in age. Examination of the skull area revealed blood beneath the skin, especially in the area of the previously mentioned bruise on the left side of the head; a fracture on the left side of the skull which was somewhat V-shaped, the long arm being approximately 2½ inches long and the short arm about 1 inch in length. He further testified that there had been extensive hemorrhaging under the skull and the brain was swollen. Examination of the tissue disclosed that the hemorrhaging was of recent origin and had occurred approximately 24 hours before death. He further testified that the bruises he had described were larger than when measured at the time of the admittance of the child to the hospital. Dr. Schrader testified that the cause of death was direct trauma to the head.

The prosecution presented as a witness Dr. Venters, who, as has been indicated, had examined the deceased child immediately before its demise. Dr. Venters is a specialist in the field of pediatrics, is head of the Department of Pediatrics at St. Paul Ramsey Hospital, and professor of pediatrics at the University of Minnesota. He testified that he had worked in the field of injuries to small children and had examined between 90 and 100 such cases in the past 2 years at St. Paul Ramsey Hospital. He had attended a national conference on the problem in 1970 and was preparing to give a report on his studies in the field at an international seminar in Vienna, Austria.

Dr. Venters testified that the term "battered child syndrome" had been introduced into medical terminology to describe the conditions which manifested themselves in this field in which he had become interested. He defined battered child syndrome as "a term that is now widely recognized as a condition by which children are injured other than by accident." That is to say, by

some adult or some other child, by causes which are not accidental.

Dr. Venters further testified that there is associated with the term "battered child syndrome" the term "battering person." This type of person fits into various patterns. One pattern is that of an individual simply repeating the type of discipline or child management to which he was subjected as a child. A child who is frequently beaten while growing up may develop the same pattern of discipline for his or her own children in later life. A second pattern is frequently seen in an individual who, as a child, has been shunted from foster home to foster home and feels rejected. A third pattern involves a role reversal in which the individual exhibits an even more significant lack of identity and poor self-concept or self-image, and when a child is born, it usually is seen as a love object who returns love and provides love for the needy parent. The fourth category of patterns involves parents who are hostile, abusive, impetuous, and who lash out at insignificant things frequently and react in a hair-triggered manner. Another category of child-abusing individuals is in the field of sexual molestation, but that usually occurs with older children.

Dr. Venters also testified that the battered child syndrome usually appears among children under 3 or 4 years of age. The statistics to which he testified show that various types of skeletal injuries are frequently seen and that the most frequently encountered are skull trauma and trauma to the so-called long bones of the body, the arms and the legs. He further testified that the fracture to the deceased infant's leg was a spiral, twisting-type fracture and that this fracture is more frequently encountered in battered-child syndrome cases than are straight-across fractures.

Dr. Venters further testified that, based upon his experience, he regarded the history of the child given by the parents as incompatible with what was found clinically and by X-rays and that injuries sustained by the child could not have happened by

accident. He testified that the cause of death was brain injury secondary to battered child syndrome. Dr. Venters had not talked with the defendant directly and did not testify that defendant was a battering parent.

■ This case presents to our court for the first time the use of the medical terminology "battered child syndrome" and "battering parent syndrome" in a case involving substantial injuries and resulting death to a minor child. Medical authorities have recently expanded their investigation into this field, which has developed from a series of conferences beginning in the late 1950's and early 1960's to the present state of medical research and analysis of the phenomena peculiar to the field. As a result of this investigation, legislation has been proposed in numerous states.[1] Minnesota adopted such legislation in 1965 regarding the reporting of maltreatment of minors. This section appears as Minn. St. 626.554. Subd. 1 thereof declares the purpose of the statute as follows:

"The purpose of this section is to provide for the protection of minor children who have had physical injury inflicted upon them, by other than accidental means, where the injury appears to have been caused as a result of physical abuse or neglect."

The previously quoted definition by Dr. Venters of the battered child syndrome fits with our statutory scheme of reporting such injuries.

■ Counsel for defendant in oral argument admitted that the deceased in this case was a battered child. However, defendant strenuously argues that the state must not only establish the battered child syndrome, but must have evidence identifying defendant as a battering parent, which was not done directly in this case. Here, the medical evidence established the various categories into which a battering parent would fall. Adequate evidence was introduced regarding defendant's termperament

---

[1] McCoid, *The Battered Child and Other Assaults upon the Family: Part One*, 50 Minn. L. Rev. 1 (hereafter McCoid).

and past experiences with the child to raise questions regarding his conduct, and the evidence was sufficient to enable the jury to find that defendant was a battering parent of the type described in the fourth category presented by Dr. Venters.

We hold that the establishment of the existence of a battered child, together with the reasonable inference of a battering parent, is sufficient to convict defendant herein in light of the other circumstantial evidence presented by the prosecution. It is very difficult in these prosecutions for injuries and death to minor children to establish the guilt of a defendant other than by circumstantial evidence. Normally, as was the case here, there are no eyewitnesses. The establishment of the fact that the deceased child was a battered child was proper, and adequate foundation was laid for the introduction of the evidence which conclusively established a battered child syndrome.[2] The prosecution properly presented to the jury the psychological framework which constitutes a battering parent. It did not attempt to point the finger of accusation at defendant as a battering parent by its medical testimony. Rather, it presented sufficient evidence from which the jury could reasonably conclude that defendant fit one of the psychological patterns of a battering parent.

■ Further, considering the facts as totally presented, particularly the fact that defendant was in exclusive control and custody of the minor child immediately prior to the report of injury, the evidence as a whole sustained a finding of his guilt beyond a reasonable doubt. In this respect, it should be noted that, other than the cold from which the child was suffering, the swelling from the apparent infection of the leg caused by the dog incident, and a small bruise on his forehead possibly caused from bumping the crib, the child was apparently in good health. The mother testified that none of the extreme bruises which were subsequently discovered on the child was apparent at the time she left the child in the custody of the defendant.

[2] See, People v. Jackson, 18 Cal. App. 3d 504, 95 Cal. Rptr. 919 (1971); McCoid, *supra*, footnote 1.

■ Defendant further claims that the circumstantial evidence in this case was insufficient to establish his guilt beyond a reasonable doubt.

The applicable rule to determine the sufficiency of circumstantial evidence was set forth originally in State v. DeZeler, 230 Minn. 39, 52, 41 N. W. 2d 313, 322 (1950), which held that circumstantial evidence will support a conviction only where the facts described by it—

"* * * form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt * * *."

Accord: State v. Beilke, 267 Minn. 526, 127 N. W. 2d 516 (1964); State v. Lundstrom, 285 Minn. 130, 171 N. W. 2d 718 (1969). In other words, circumstantial evidence "must do more than create a suspicion of guilt. It must point unerringly to the accused's guilt." 40 Am. Jur. 2d, Homicide, § 426, citing with approval, State v. DeZeler, *supra*. However, in determining whether there is sufficient evidence to support the jury's conclusion, the facts must be reviewed in the light most favorable to a finding of guilt. State v. Ellingson, 283 Minn. 208, 167 N. W. 2d 55 (1969); State v. Daml, 282 Minn. 521, 162 N. W. 2d 240 (1968).

In State v. Kotka, 277 Minn. 331, 334, 152 N. W. 2d 445, 448 (1967), it was stated:

"* * * [A] conviction upon circumstantial evidence cannot be sustained, against the presumption of innocence, unless the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of his guilt."

We are of the opinion that the circumstantial evidence at trial established defendant's guilt beyond a reasonable doubt. Defendant's conduct with the decedent prior to the incident in question, his prior displays of temper, his exclusive control over the baby at or near the time the death-causing injuries were sustained,

the improbability that decedent could have sustained such multiple injuries as a result of a fall from a height of 2 feet, and competent medical testimony to the effect that death had not been caused by accident are elements which "form a complete chain" leading "directly to the guilt of the accused." No reasonable inference other than guilt exists.

■ Defendant asserts that the trial court erred in four different instances by allowing into evidence certain statements by Officer Carolen Bailey. We have closely scrutinized the statements in question and hold that error, if any existed, did not materially prejudice defendant.

Affirmed.