Barbara Alice SCHLERET, petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

Nos. 48197, 50363.

Supreme Court of Minnesota.

Nov. 6, 1981.

Fryberger, Buchanan, Smith, Sanford & Frederick, William D. Sommerness and Joseph R. Cade, Duluth, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Jerry S. Anderson and Gary Hansen, Sp. Asst. Attys. Gen., St. Paul, Donald J. Diesen, County Atty., Carlton, for respondent.

OTIS, Justice.

This is an appeal from a conviction for first degree manslaughter arising out of the death of appellant's stepson, Brian Schleret, age three. We affirm.

We having previously upheld convictions for felonious assaults on children where, in the absence of direct evidence there was circumstantial evidence to support a finding that the child had been a victim of a succession of non-accidental instances of harm at the hands of someone else. The term we have adopted to describe the offense is the "battered child syndrome." *State v. Goblirsch*, 309 Minn. 401, 246 N.W.2d 12 (1976); *State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973).

In *Loss* we adopted a definition of "battered child syndrome" provided by the testimony of Dr. H. Venters. "Battered child syndrome," in his words, is " * * * [A] condition by which children are injured other than by accident." *State v. Loss*, 295 Minn. at 277, 204 N.W.2d at 407. Dr. Venters also testified in the instant case. His testimony summarized the symptoms needed to support such a diagnosis. He testified that successive, non-accidental instances of harm done to a child can occur in a variety of forms, and the identifying symptoms and their number vary accordingly. "Battered child syndrome" can be evidenced by multiple injuries in various stages of healing.

Before one injury heals, another injury occurs. Examples of such successive injuries include bruises, burns, and fractures. The child need not have suffered more than one of those successive injuries to permit the diagnosis. The absence of burns and fractures, for example, does not mean that a repeatedly bruised child is any less a victim of "battered child syndrome."

The succession of harm done to the child may extend over several months or more, but it may occur in as brief a time as a few weeks. Physicians do not wait for, nor do judges require, that a child pass an endurance test of abusive corporal punishment before there is proof of a "battered child syndrome."

The harm done is often in a context of outbursts of bad temper by a parent triggered by what the parent sees as the child's failure to be or to give what the parent wants. Ordinary problems such as the child's slowness to become toilet trained become a provocation, and the parent responds with abuse, ranging from the unsanitary treatment of the child to beatings. The parent often shows indifference to the harm done in those beatings.

Much of the evidence that can be gathered to show an instance of "battered child syndrome" is circumstantial. In allowing such evidence to support a conviction, this court has recognized that those felonious assaults are in a unique category. Most cases of felonious assault tend to occur in a single episode to which there are sometimes witnesses. By contrast, cases that involve "battered child syndrome" occur in two or more episodes to which there are seldom any witnesses. In addition, they usually involve harm done by those who have a duty to protect the child. The harm often occurs when the child is in the exclusive control of a parent. Usually the child is too young or too intimidated to testify as to what happened and is easily manipulated on cross-examination. That the child in the instant case did not survive, strengthens, rather than diminishes, the law's concern for the special problems of prosecuting a defendant in a "battered child" case. As

background, direct testimony of earlier episodes of harm done to the child is admissible.

Crucial to identifying such cases are the discrepancies between the parent's version of what happened to the child when the injuries occurred and the testimony of medical experts as to what could not have happened, or must have happened, to produce the injuries.

In late October 1976 Brian Schleret and the two other Schleret children were removed from the custody of their mother, Evelyn Kelly, and placed in the custody of their father, John Schleret, and his new wife, Barbara Schleret. Mrs. Schleret is described as easy to anger and physically strong. She became repeatedly and increasingly angered by what she regarded as Brian's slowness to become toilet trained. Prosecution witnesses testified that on such occasions she often spanked Brian vigorously with a plaster lath, less frequently when his father was present. Afterwards she made Brian "sit in it" for twenty minutes or more, in the bathroom, on the floor, with the door shut, and the lights out. Brian was a slow eater which prompted a slap to his head or a spanking. Brian sometimes played with things such as clay which resulted in corporal punishment. Relatives who witnessed these episodes often could not understand what Brian had done to provoke the defendant. Toward the end of January 1977, according to the defendant's sister-in-law who then regularly babysat for her, the defendant began spanking Brian several times a day because Brian had not become toilet trained.

On the evening of February 22, 1977, according to the defendant's husband, the defendant told him that Brian had slipped and fallen down the carpeted stairs inside the house. The defendant's husband saw a black and blue mark on one side of Brian's head. The defendant's sister-in-law, present that evening, testified that the bruise was bright red, about the size of a hand, and in the shape of finger marks. She also testified that the defendant told her that Brian "had thrown a David," or a fit, and had then fallen down the stairs.

Defendant's version was that Brian fell, not on February 22, but on March 2, just as she called him to come downstairs to go to a doctor for an examination. The defendant says she did not see Brian start to fall, but heard one thud, turned around, and saw Brian's head hit low on the wall at the bottom of the stairs. Asked about the position of Brian's body at that moment, she says that he was "curled up in a ball." She says that Brian then got up, did not cry, and walked away.

One of the injuries discovered in the autopsy performed after Brian's death was a skull fracture six inches long. Dr. Kundel, who performed the autopsy, estimated that the injury occurred one week earlier, and thus the skull fracture occurred one week after the date the defendant gave when she spoke of Brian's fall to her husband, her sister-in-law, and the sheriff, though the defendant says, in her testimony, that the fall occurred one week before Brian's death. The medical experts agree that this injury is not inconsistent with a fall. However, the medical expert called by the defense, Dr. G. Peterson, qualified this assessment by noting that he was assuming that Brian fell the full flight of stairs and that during the fall his body would have tended to become uncoiled producing a whipping motion and the acceleration into impact necessary to cause the kind of skull fracture Brian had sustained. This testimony for the defense conflicts with the defendant's account of there having been just one thud and Brian then landing curled up in a ball. Though the jury could choose which version they would believe, accepting either version does not allow a rational hypothesis that a skull fracture resulted from the fall Brian supposedly took.

In addition, one could believe that a three-year-old child might not cry after falling down some stairs, but to accept as a fact that after a fall downstairs into a wall which caused a skull fracture six inches long a three-year-old would simply get up, walk away, and not cry, flies in the face of all human experience.

Around noon on March 2, 1976, the defendant, according to her husband, told him that there was an appointment that day for Brian to be examined by a physician, Dr. Butler. The defendant says that she decided to have Brian examined because she had noticed Brian's legs turning blue when she held him on her lap and thought his heart might be malfunctioning, and because he had not stopped wetting his bed. Dr. Butler testified, however, that his examinations are not by appointment but on a walk-in basis, that the defendant did not mention anything about Brian's legs turning blue, and that she mentioned a fall by Brian but not when it occurred.

In examining Brian, Dr. Butler found bruises on the left side of Brian's face and on his left ear and estimated these purple bruises to be about one week old. He ordered an electrocardiogram, but did not take x-rays, and did not find a fracture of Brian's skull.

The next day, March 4, 1976, the defendant telephoned Dr. Butler's office, spoke to his secretary, and asked solely for the results of the heart examination. The results were normal. On a drive taken afterwards, the defendant, according to her husband, told him that she was beginning to hate the kids.

Two days later, on March 6, 1977, the defendant's brother-in-law came by for a brief visit. He testified that Brian complained about his buttocks being sore, and that Brian refused to play.

On March 7, 1977, the defendant's mother-in-law saw Brian trip, fall and bump the left side of his forehead on a wooden toy. She watched to see if a bruise would develop because, as she testified, the defendant had told her Brian had thin blood and bruised easily. No bruise appeared on Brian's forehead while she was there that evening. The autopsy found no bruise at that place on Brian's body.

Thus, up to March 9, 1976, the day Brian went into a coma, there is no evidence of an accident from which the massive, fatal hematoma in Brian's brain could have resulted. The defendant says that she did not strike or spank Brian during the prior two weeks but provided no explanation for Brian's complaint on March 6 that his buttocks were sore, nor for his black eye, swollen neck, and bleeding buttocks in early December.

Dr. Butler, at the examination on March 9, found that the facial and ear bruises observed on March 2, were now accentuated, and much redder, a sign that new bruises had been sustained in the same place as the older bruises. On Brian's lower back there were two new hemorrhagic areas. His buttocks, which on March 2 had been without bruises, were now bruise inflamed from the right side to the left and from just below the waist to the genitals.

After Dr. Butler's examination, Brian was rushed to another hospital where a neurosurgeon, Dr. Donley, examined Brian. By then Brian's breathing had to be maintained artificially. X-rays of Brian's head revealed a skull fracture on the right side. Suspecting severe brain damage from a blood clot or swelling of blood, Dr. Donley operated on Brian to relieve pressure on the brain. The surgery revealed a massive blood clot on the left side of Brian's brain. Brian died the next morning. Dr. Donley testified that the blood clot caused Brian's death; that an impact between an external force and the left side of the head caused the clot, which would explain the ripping of blood vessels in that location; that the clot had formed rapidly, no more than 24 hours before the surgery, or not earlier than 5:45 p. m. of March 8. The time of the injury and its location exclude the possibility that Brian's bumping his head on a wooden toy on March 7, caused the blood clot.

A pathologist, Dr. Kundel, performed an autopsy on Brian and found a fracture, one week old, on the back right side of the skull; bruises over the skull fracture, one, a week old, and the rest a day old; bruises, one day old, on both ears, the left side of the skull (under which the blood clot formed) and over the right eye; deep bruises, one day old, on the buttocks (these bruises extended more than an inch into the tissue); and multiple bruises on the back of

both arms, in the palms of the hand, and on the left thigh, the date of these not estimated. Thus, the jury had evidence of at least two recent episodes of injuries to Brian, one less than 24 hours before the late afternoon of March 9, and one a week earlier. The earlier episode, which included the fracturing of Brian's skull, was a week after the time when defendant was explaining to her husband and sister-in-law that the bruises on Brian's head were from his having fallen down the stairs. The later episode, which included the blood clot on the brain from which Brian died, occurred no more than 24 hours and perhaps as few as two hours before surgery on Brian at 5:45 p. m. on March 9.

The defendant's testimony that she did not strike Brian on March 9, and that no major accident happened to him is clearly inconsistent with the fact that Brian suffered severe injuries almost certainly on March 9, while in the defendant's exclusive control.

Dr. Venters testified "I have never seen injuries of this extent and this number and this duration caused by a pure and simple accident," and that in his opinion Brian's death resulted from a "battered child syndrome." After Brian went into a coma, appellant did not call for an ambulance and although she had a valid driver's license and there was a car available to her, she waited for over 20 minutes for her husband to drive home during which time instead of watching over Brian she remained in another room combing her hair.

Viewing these circumstances surrounding Brian's death, a jury might reasonably conclude that no other rational hypothesis could explain what happened to him except that appellant, having severely beaten him on more than one occasion, finally caused his death.

Affirmed.

WAHL, Justice (dissenting).

I must respectfully dissent. Though this is a close and difficult case, I am not persuaded that the evidence is sufficient as a matter of law to support the conviction.

In *State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973), this court noted the difficulty of establishing the guilt of a defendant accused of injuring a small child other than by circumstantial evidence and reiterated this rule to determine the sufficiency of such evidence:

The applicable rule to determine the sufficiency of circumstantial evidence was set forth originally in *State v. DeZeler*, 230 Minn. 39, 52, 41 N.W.2d 313, 322 (1950), which held that circumstantial evidence will support a conviction only where the facts described by it—

" * * * form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt * * *."

In other words, circumstantial evidence "must do more than create a suspicion of guilt. It must point unerringly to the accused's guilt."

*Id.* at 281, 204 N.W.2d at 409 (citations omitted). In *Loss*, the 6-month-old victim was brought to the hospital by her father, who had been alone with the baby and reported that the child had fallen from the 2-feet-high bed on which she lay to the floor below. The child died of brain injuries the following day. *Id.* at 275, 204 N.W.2d at 405–06. X-rays disclosed a small skull fracture and a spiral, twisting-type fracture of her leg, findings which the doctors testified were inconsistent with the medical history given by the father. *Id.* at 275, 278, 204 N.W.2d at 406, 408. This court affirmed the father's conviction of first-degree manslaughter, noting his temper, his exclusive control over the baby at the time the injuries occurred, and medical testimony to the effect that the baby's injuries were unlikely to result from a 2-foot fall and that her death had not been caused by accident. *Id.* at 281, 282, 204 N.W.2d at 410. We held that "the establishment of the existence of a battered child, together with the reasonable inference of a battering parent," was sufficient, in light of the circumstantial evidence, to convict the defendant father. *Id.* at 280, 204 N.W.2d at 409.

In *State v. Goblirsch*, 309 Minn. 401, 246 N.W.2d 12 (1976), defendant was convicted of the first-degree manslaughter of his 2-month-old daughter. The *Goblirsch* infant, like Brian Schleret, died of a subdural hematoma. There, defendant father told medical authorities that the child had struck her head accidentally on a toy or on the side of her crib. The examining physician, however, did not believe that the injuries could have been caused accidentally. He testified, further, that the baby had suffered 13 fractured ribs, which were in various stages of healing at the time of her death. We affirmed the conviction, noting that the "fatal, nonaccidental, and traumatic head injury" occurred at a time when defendant exercised exclusive control over the infant. 309 Minn. at 406, 246 N.W.2d at 14.

In the case before us, Brian Schleret died of a rapidly growing blood clot, which, doctors testified, had formed between 2 and 24 hours before his death. Defendant Barbara Schleret exercised exclusive control over Brian during the morning of Wednesday, March 9. Unlike the defendants in *Loss* and *Goblirsch*, however, defendant gave medical authorities no unlikely account of an injury to Brian's head that morning. She told no story which would account for recent trauma at all; rather, she told doctors that Brian had fallen down the stairs a week earlier, a history not inconsistent with test results showing that Brian had suffered a skull fracture which was 1 week old when he died. Unlike the infant victims in *Loss* and *Goblirsch*, Brian suffered no broken bones. He did not suffer the twisting fractures of the long bones, broken ribs, burns or whip lacerations frequently observed in battered children. None of the injuries or bruises was more than 1 week old. Although many of the state's witnesses testified to Barbara's harsh punishment of Brian, none indicated that they ever saw her use unreasonable force or deliberately injure the child.

In a first-degree manslaughter conviction, the victim's death must result from an assault committed with such force that death or great bodily harm was foreseeable in light of the circumstances. As we recognized in *Goblirsch*, even in a battered child case, the crucial question is one of causation. The doctors who testified here indicated that the blood clot which caused Brian's death probably resulted from trauma to Brian's head occurring some time after the skull fracture. They conceded that a smaller force or trauma might be necessary to cause the blood clot once a skull fracture had been sustained, and that the linear fracture Brian suffered was not inconsistent with defendant's "story" that he fell down the stairs and hit the back of his head against a wall a week before his death. Brian himself told his natural mother, Evelyn Kelly, that he fell down the steps. Defendant observed that Brian suffered speech and balance problems after the fall, and told her husband about these observations. Bertha Schleret, Brian's grandmother, saw Brian fall and strike the left side of his forehead on a wooden toy on the evening of March 7.

In light of the evidence that, following Brian's skull fracture, a minor trauma could have caused the subdural hematoma, I am not satisfied that there was proof beyond a reasonable doubt that defendant could have foreseen that any blows she may have struck would lead to death or great bodily harm. Our holdings in *Loss* and *Goblirsch* do not require an inference that, when a child dies of unknown causes not inconsistent with accidental causes, the parent responsible for his care is criminally responsible for his death. Our holding in *State v. Loebach*, 310 N.W.2d 58 (Minn.1981), also makes clear that to introduce evidence of battering parent syndrome or to establish the character of the defendant as a battering parent is error unless the defendant first raises that issue. The error in this case was highly prejudicial. I would reverse.

SHERAN, Chief Justice (dissenting).

I join in the dissent of Justice Wahl.