**STATE of Iowa, Appellee,**

v.

**Kenneth Ray McKOWEN, Appellant.**

No. 88–610.

Court of Appeals of Iowa.

Aug. 23, 1989.

William L. Wegman, State Public Defender and James F. Whalen, Asst. State Public Defender, for appellant.

Thomas J. Miller, Atty. Gen., Sheryl A. Soich, Asst. Atty. Gen., and Melodee Hanes, Asst. Polk County Atty., for appellee.

Considered by OXBERGER, C.J., and HAYDEN and HABHAB, JJ.

OXBERGER, Chief Judge.

Kenneth Ray McKowen appeals from his jury conviction for child endangerment. He contends that the trial court erred in overruling his motion to suppress statements he made to a child abuse investigation team, and in allowing an expert witness to testify that the victim's condition could be described as "battered child syndrome." Our scope of review on the question of the voluntariness of the statements allowed in evidence is of the totality of the circumstances under which those statements were given. *State v. Hodges*, 326 N.W.2d 345 (Iowa 1982). When reviewing the admissibility of expert testimony we look for a clear showing of abuse of discretion by the trial court. *State v. Halstead*, 362 N.W.2d 504, 506 (Iowa 1985). We affirm the conviction.

On August 26, 1987, Kenneth and Patricia McKowen took their fifty-seven day old infant son, Brian, to Iowa Lutheran Hospital because the baby showed symptoms of digestive system distress and had a rumbling in his chest. The hospital admitted him for diagnostic tests.

A nurse noticed bruises on Brian's buttocks and legs while she was preparing him for a procedure. She alerted the physician on duty, then she notified Child Protective Services. This agency responded by starting a routine child abuse investigation on the same day, in the hospital, taking photos of the child and interviewing the parents.

Two days later, on the 28th of August, the parents appeared for separate questioning sessions at the offices of the juvenile court services conducted by the Polk County "Trauma Team." At this point, Brian was still in the hospital, and his parents were unaware of the extent of his injuries.

Paul Houston, a member of the "Trauma Team" asked Kenneth McKowen if people, other than he and his wife, were physical caretakers of Brian. McKowen responded that he and his wife were the sole caretakers. Houston then explained to McKowen that Brian had numerous fractures all over his body. He asked McKowen if he knew of any accidents that could have caused these injuries. McKowen said he knew of no accidents.

Houston then explained to McKowen that the purpose of the investigation was to determine how the baby had been injured. Houston posed the proposition that if there were no accidents, and the parents were the sole caretakers of the infant, that left only the parents as responsible. McKowen admitted that he was responsible. Houston then read McKowen his *Miranda* rights as a precaution. McKowen agreed to continue the interview without an attorney present, and eventually executed a signed statement admitting responsibility for the injuries to the infant.

Prior to the trial, McKowen moved to suppress evidence of the statements he made to the "Trauma Team." The motion was overruled. McKowen asserts that the trial court erred in this ruling because his incriminating statements were not voluntarily made and that he was induced to cooperate by promises of returning his child to the custody of his wife and himself.

## I. Voluntariness of the Incriminating Evidence

■ The issue of the voluntary nature of the statements made requires sorting out the impetus for the inculpatory statement. *State v. Hodges*, 326 N.W.2d 345, 348 (Iowa 1982). A promise of help or leniency by a person in authority negates the voluntary nature of an incriminating statement, and is inarguably inadmissible. *Id.* The participants in the child abuse investigation testi-

fied no such promises were made. The only evidence that there may have been promises was the testimony of McKowen and his wife as to what they believed. His testimony on this issue was unconvincing at trial and fails to persuade this court. The State has the burden of proof in establishing that McKowen's admissions were made voluntarily, and this burden was met by the reliable testimony offered into evidence. *See State v. Hodges*, 326 N.W.2d 345, 347 (Iowa 1982).

However, the totality of the circumstances requires review of the context in which the statements were made and the characteristics of the accused. *Id.* McKowen is six foot tall, three hundred pounds, forty years old, has a high school education and works in a supervisory position. He was sober and rested at the time of the interview. He probably was truly worried about his son. However, it is unlikely that this emotional concern critically impaired his capacity for self-determination. *Id.*

McKowen characterizes the interview as an interrogation. The record does not bear this out. The interview at which McKowen made his inculpatory statements was conducted by social workers in street clothes in an office setting. This was clearly a routine investigation expressly for the purpose of determining whether there was any justification for authoritative action at all. The focus of the interview was not accusational. This was a preliminary dialogue to determine whether to proceed on a basis of a suspicious focus.

There was no threat made to induce McKowen to appear for the interview, nor at any time were consequences made apparent should he refuse to cooperate, or give any specific information sought by the agency. He could have walked out.

McKowen contends he was unaware of the seriousness of his child's condition before the questioning session. He was surprised to hear of Brian's fractures. Houston told McKowen of the seriousness of the injuries early in the interview, yet McKowen continued to make incriminating statements. The *Miranda* warning was read to him. The language of *Miranda* told

McKowen he could remain silent, seek an attorney, and anything he might say could be used against him in court. At this point a reasonable person is aware that there could be consequences to his statements. McKowen, nevertheless, continued to answer Houston's questions and write an inculpatory statement. *See McCormick on Evidence* § 153, at 402 (3rd ed., 1984).

McKowen had a basic understanding of the nature of the offense to which he was admitting though he may not have had sufficient legal information to make a reasoned legal decision about what he did say. We do not require that a suspect become a lawyer if he chooses not to retain one before we let him issue incriminating statements. After considering the totality of the circumstances, we find the trial court did not err by denying McKowen's motion to suppress this evidence.

## II. Admissibility of expert testimony on Battered Child Syndrome

■ McKowen next urges that the trial court erred by admitting expert testimony concerning battered child syndrome. Courts welcome the testimony of an expert who is in a better position through education and experience to have an opinion on relevant facts and circumstances than the trier of fact. *See State v. Myers,* 382 N.W.2d 91, 97 (Iowa 1986).

Dr. Ellerbroek, the pediatric radiologist who evaluated the x-rays taken of Brian McKowen at the hospital, testified as a witness for the prosecution. Dr. Ellerbroek explained the technical findings, interpreting the x-ray evidence to the jury. He offered his professional opinion that the variety in the ages of specific skeletal traumas in the child, the multiplicity of the fractures and their presence in various parts of the child, and the degree of force necessary to fracture an infant's ribs and joints, is inconsistent with a finding of accidental injury. After a thorough explanation of each trauma, ruling out congenital defect and self-inflicted injury, he categorized the pattern disclosed by the x-rays as typical of battered child syndrome.

At about the two-thirds point of his testimony, Dr. Ellerbroek stated:

It just fits a criteria and as a syndrome is absolutely an observation that something occurs in a particular way. Doctor Henry Kemp described it in 1962 as the "battered child syndrome" to a group of infants who are—who have suffered physical acts committed intentionally by the caretaker.

This is the only mention of the syndrome during Dr. Ellerbroek's lengthy testimony on Brian's injuries. He made no statements as to the identity of any person who may have inflicted the injuries. An expert witness is not permitted to express an opinion on the accused's guilt or innocence. *Myers,* 382 N.W.2d at 91, 97 (citations omitted). The doctor's opinion that Brian's pathology is consistent with battered child syndrome is a conclusion based upon an extensive study of similarly-injured children by medical science. *See People v. Jackson,* 18 Cal.App.3d 504, 95 Cal.Rptr., 919 (1971); *see also State v. Hilleshiem,* 305 N.W.2d 710, 715 (Iowa 1981) (not using term "battered child syndrome"); *People v. Barnard,* 93 Mich.App. 590, 286 N.W.2d 870, 871 (1979). We find the witness expressed no opinion as to whether McKowen was guilty of child endangerment.

McKowen urges that because the evidence clearly established that he was one of Brian's primary caretakers, Dr. Ellerbroek's testimony crossed the line between expressing an opinion helpful to the jury and conveying a conclusion as to McKowen's guilt. McKowen further urges that because there is an inflammatory effect of the term and the use of the term was not necessary, the prejudicial effect of the evidence outweighed its probative value. *See State v. Dumlao,* 3 Conn.App. 607, 491 A.2d 404, 409 (1985); *State v. Tanner,* 675 P.2d 539, 543 (Utah 1983); *Washington v. Mulder,* 29 Wash.App. 513, 629 P.2d 462, 463 (1981).

The term "battered child syndrome" was coined after more than twenty years of extensive research and has become an accepted medical diagnosis. *Commonwealth v. Rodgers,* 364 Pa.Super. 477, 485, 528 A.2d 610, 614 (1987) (citing generally Kempke, Silverman, Steele, Droegemueller and Sil-

ver, *The Battered Child Syndrome*, 13 J.A.M.A. 105 (1962)). This diagnosis is used when a young child is found to have "multiple injuries in various stages of healing, primarily multiple fractures, soft tissue swelling or skin bruising." *Rodgers*, at 486, 528 A.2d at 614.

The seminal case on the issue of this syndrome's admissibility appears to be *People v. Jackson*, 18 Cal.App.3d 504, 95 Cal. Rptr. 919 (1971). The California Court of Appeals described the syndrome in detail:

> This syndrome means that a child has received repeated and/or serious injuries by non-accidental means; characteristically, these injuries are inflicted by someone who is ostensibly caring for the child. There are several elements that are the criteria for the "battered child syndrome." They are (1) the child is usually under three years of age; (2) there is evidence of bone injury at different times; (3) there are subdural hematomas with or without skull fractures; (4) there is a seriously injured child who does not have a history given that fits the injuries; (5) there is evidence of soft tissue injury; (6) there is evidence of neglect.

*Jackson*, at 506, 95 Cal.Rptr. at 921.

Most states that have considered "battered child syndrome" testimony uphold its admission. *See State v. Holland*, 346 N.W.2d 302 (S.D.1984); *Schlerert v. State*, 311 N.W.2d 843 (Minn.1981); *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978).

Testimony on battered child syndrome in a case such as the case sub judice—where the victim is an infant, incapable of communication, and possesses fractures of various ages in his ribs and extremities, is highly relevant evidence when the jury is asked to decide the mens rea element of the offense of child endangerment.

> As the Minnesota Supreme Court said: Much of the evidence that can be gathered to show an instance of "battered child syndrome" is circumstantial. In allowing such evidence to support a conviction, this court has recognized that those felonious assaults are in a unique category. Most cases of felonious assault tend to occur in a single episode to which there are sometimes witnesses. By contrast, cases that involve "battered child syndrome" occur in two or more episodes to which there are seldom any witnesses. In addition, they usually involve harm done by those who have a duty to protect the child. The harm often occurs when the child is in the exclusive control of a parent. Crucial to identifying such cases are the discrepancies between the parent's version of what happened to the child when the injuries occurred and the testimony of the medical experts as to what could not have happened, or must have happened, to produce the injuries.

*State v. Durfee*, 322 N.W.2d 778, 783 (Minn.1982). (Citations omitted.)

Dr. Ellerbroek did not testify that the battered child syndrome from which this victim suffered was in fact caused by the defendant. Nowhere did the doctor express an opinion as to the defendant's guilt or innocence.

We conclude that admission of the "battered child syndrome" as it was permitted in this case was not error.

AFFIRMED.