STATE of Minnesota, Respondent,

v.

Kenneth Octavius WALLACE, Appellant.

No. C2–96–340.

Supreme Court of Minnesota.

Jan. 16, 1997.

John M. Stuart, Minnesota State Public Defender, Scott G. Swanson, Asst. State Public Defender, Minneapolis, for appellant.

Kenneth O. Wallace, Stillwater, pro se.

Hubert H. Humphrey, III, Minn. Atty. General, St. Paul, for respondent.

Michael O. Freeman, Hennepin County Atty., Linda M. Freyer, Asst. County Atty., Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

A jury found appellant Kenneth Octavius Wallace guilty of first-degree felony murder for killing the boyfriend of a woman he was attempting to sexually assault, two counts of attempted second-degree criminal sexual conduct, and second-degree assault. Appellant now seeks reversal of his convictions for first-degree murder, Minn.Stat. § 609.185(2) (1994), and attempted second-degree criminal

sexual conduct, *id.* § 609.343, subd. 1(b), (c). Appellant argues that the circumstantial evidence introduced against him was insufficient to prove an intent to commit criminal sexual conduct. *See id.* § 609.17, subd. 1 (making intent an element of attempts).

On the night of February 24, 1995, according to trial testimony, 20–year–old Rachel Lott was assaulted and her 17–year–old boyfriend, Kenneth Williams, was stabbed to death. At that time, Lott was living with 19–year–old Taketa Jones and 22–year–old Erica Green at 2528 Portland Avenue South, apartment 201, in Minneapolis. Appellant, age 49, lived with his girlfriend, Nina, across the hall from Lott in apartment 202. Lott and her roommates did not know appellant very well but they knew who he was, having seen him a few times since they moved in. They were better acquainted with Nina. Williams lived downstairs with his mother in apartment 103.

Just prior to the assault and stabbing, Lott, her roommates, and Williams were watching television in apartment 201 when they heard a knock on the door. Lott opened the door and appellant was there in the hallway. Appellant told Lott that Nina wanted to see her. Lott began walking toward appellant's apartment, which was about 5 feet away and directly across the hall. Williams followed her at first, but Lott told Williams to wait for her and that she would be right back. Williams then returned to Lott's apartment.

Lott testified that appellant locked the door after she entered his apartment. Lott asked where Nina was, and appellant told her that Nina was "in the back." Lott walked through appellant's living room and entered the back bedroom, but she could not see anyone there.

When Lott began to ask appellant where Nina was, he put one hand over Lott's mouth and used his other arm to pin her arms to her sides. As Lott struggled, appellant told her to shut up and to not say anything. With his hands on Lott's stomach and his knee in her back, appellant forced Lott face down onto his bed. Appellant said, "Don't scream, don't say nothing, shut up." Lott pleaded with appellant to let her go. She took money out of her pocket and told appellant that he could take it, that it was not worth it, and that she would not tell anyone. Lott put her money on the bed, but appellant continued to tell her to shut up. With his knee still in Lott's back, appellant tore up a bed sheet and used the strips to tie Lott's hands behind her back and to gag her mouth.

Appellant then rose from the bed to retrieve a large knife from somewhere nearby. Appellant returned to the bed, put the knife to the back of Lott's neck, and said, "If you don't shut up, I'm going to cut you," and, "I know what I'm doing." Lott could see that appellant was wearing jeans and an army jacket, open, with no shirt on underneath the jacket. Panicking, Lott became quiet and turned her face away from appellant.

Lott further testified that when she again turned to look at appellant, he was standing up with his hands on his belt buckle, "taking it loose." Appellant unbuckled his belt, but Lott could not tell whether appellant's pants were loose. Appellant again told Lott to shut up. Lott was laying across the bed, with her feet hanging over the side, and appellant was at her feet. Lott then turned her face back around, away from appellant, wondering whether appellant was going to rape her: "I was wondering what was he going to do, was he going to kill me, was he going to rape me, how was he going to kill me, wondering what is going to happen next[?]" However, when directly questioned about her fears, Lott stated that she thought that "he was going to rape me." After a minute or so of quiet, Lott looked down the hallway and saw appellant on top of Williams, wrestling with him on a bed in the living room.

Meanwhile, several minutes after Lott had left her apartment, Jones mentioned that Lott had been gone for a while. Joyce King, another second-floor neighbor, knocked on the door, looking for Lott. Williams spoke with King, and then exited Lott's apartment with Lott's roommates.

Williams began knocking on the door of appellant's apartment. Both Williams and Jones called to Lott, but there was no reply. Jones tried ringing the door bell. After

about 5 minutes of loud knocking, Williams threatened to break the door down. At that point, appellant opened the door a crack and motioned Williams inside. Williams entered appellant's apartment, the door closed, a locking sound was heard, and Lott's roommates returned to Lott's apartment.

In shock, Lott did not hear knocking, yelling, or Williams's entrance. But when she turned around and saw appellant on top of Williams in appellant's living room, Lott removed the sheet strips from her wrists, took off her gag and threw it to the floor, and ran past appellant and Williams to the apartment door. Lott unlocked appellant's door and ran back to her apartment, screaming. Using Williams's nickname, Lott yelled, "He got Fluffy. Call the police. He got Fluffy," or "He killed Fluffy." Jones called the emergency number, 911, and told the operator that a boy had been kidnapped and was being held at gunpoint in apartment 202.

Still screaming, Lott ran downstairs to Williams's mother's apartment. There, Lott found Paul Williams, the boyfriend of Williams's mother. According to Paul Williams's testimony, Lott told him that she had been tied up, that someone tried to rape her ("or something"), and that something had happened to Kenneth Williams. Apparently hysterical, Lott turned and ran from apartment 103.

King testified that after Lott ran from appellant's apartment, King returned to her own apartment on the second floor. As King was preparing to leave her apartment again, she saw appellant exiting his apartment. She quickly shut and locked her door and, through her peephole, watched appellant walk past her apartment and out the back door, which is next to King's door and leads to the back stairs of the building. Appellant did not appear to have a weapon when he passed King's apartment.

Green had locked the door to apartment 201. But about 3 minutes after Lott ran downstairs, Green heard a knock and Williams saying, "I can't breathe. Help me." Green opened the door and saw Williams lying on his back in the hallway, bleeding. Jones called an ambulance.

Soon police arrived and saw Williams lying in the hallway and bleeding from his sides. An officer asked him what happened, but Williams did not respond before the officer noticed that appellant's apartment door was open. Williams was asked if that apartment was where it happened. He said yes and asked where the ambulance was. The officers sweep searched appellant's apartment for their safety and to look for victims, but they found no one. However, the officers did testify that they saw a bloody knife behind the front door, blood on a mattress in the living room, and a knife sheath in the back bedroom.

Williams died a few minutes later. A Hennepin County medical examiner testified that the cause of death was a stab wound near his armpit. Williams also suffered non-fatal wounds, some of which seemed to have been incurred while warding off an attack.

After obtaining a search warrant, investigators re-entered appellant's apartment and found the bloody knife, the knife sheath, a second knife on the back bedroom floor at the head of the bed, and a blood-splattered mattress in the front living room. In the living room, investigators also saw broken glass and red stains on some furniture, the wall, and a knocked-over chair. A pair of scissors, money, three strips of bed sheet (one knotted), and the remainder of the sheet were found on the bed in the back bedroom. The medical examiner testified that it was possible that either of the knives found in appellant's apartment were used to inflict Williams's injuries.

Crying and frightened, Lott approached an officer at the scene and spoke with him, but she was too upset to give a formal statement that night. Lott was eventually sent to a hospital and sedated.

The next day, appellant visited a friend, Tillie Richie, and told her that he had a fight with his girlfriend and needed a place to stay. Appellant and Richie argued, and he did not stay that night. Police arrested him near Richie's home when appellant returned to pick up a check on March 2.

The jury deliberated for 1 day, during which they requested and received copies of

the jury instructions to study the elements of criminal sexual conduct, and were allowed to hear Lott's testimony recited by the court reporter. On October 5, the jury convicted appellant on four counts: first-degree murder of Williams under Minn.Stat. § 609.185(2) (causing death while committing or attempting to commit first- or second-degree criminal sexual conduct with force or violence, either upon or affecting the person or another); attempted second-degree criminal sexual conduct under § 609.343, subd. 1(c) (sexual contact under circumstances causing Lott to have a reasonable fear of imminent great bodily harm to her or to another); attempted second-degree criminal sexual conduct under § 609.343, subd. 1(d) (sexual contact while armed with a dangerous weapon that was used or threatened to be used to cause Lott to submit); and second-degree assault of Lott under § 609.222 (assault with a dangerous weapon). Verdicts were not returned on four other charges submitted to the jury: two counts of second-degree murder and two counts of attempted first-degree criminal sexual conduct.

The court sentenced appellant to mandatory life imprisonment without the possibility of release for first-degree murder pursuant to Minn.Stat. § 609.184, subd. 2(1); a concurrent 54–month sentence and $150 fine for attempted second-degree criminal sexual conduct with fear of imminent great bodily harm; and a concurrent 65–month sentence and $300 fine for second-degree assault.

■ Appellant contends that the circumstantial evidence of his intent was insufficient to convict him of first-degree murder and attempted second-degree criminal sexual conduct. There was no evidence that appellant actually engaged in sexual penetration or sexual contact with Lott. Hence, both his first-degree murder conviction under Minn. Stat. § 609.185(2) and his attempted second-degree criminal sexual conduct convictions under Minn.Stat. § 609.343, subd. 1(c), (d) required proof beyond a reasonable doubt that appellant intended to sexually assault Lott. *See id.* § 609.17 (requiring intent for an attempt conviction); *id* § 609.02, subd. 9(4) (defining intent); *State v. Zupetz,* 322 N.W.2d 730, 733–35 (Minn.1982).

■ In reviewing a sufficiency of the evidence claim, we are limited to ascertaining whether a jury, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty based on the facts in the record and any legitimate inferences therefrom. *E.g., State v. Atkins,* 543 N.W.2d 642, 646 (Minn.1996). We view the evidence in a light most favorable to the verdict, and assume that the jury disbelieved any evidence in conflict with that result. *Id.; State v. Raymond,* 440 N.W.2d 425, 426 (Minn.1989) (concluding that physical evidence of the struggle and other circumstantial evidence supported the conclusion that the defendant intended to kill his victim during a burglary); *State v. Bias,* 419 N.W.2d 480, 486 (Minn.1988).

■ We have also stated that circumstantial evidence in a criminal case is entitled to as much weight as any other type of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational or reasonable hypothesis except for that of guilt. *State v. Pilcher,* 472 N.W.2d 327, 335 (Minn.1991); *see also State v. Landin,* 472 N.W.2d 854, 858–59 (Minn.1991) (reviewing a conviction based entirely on circumstantial evidence and requiring a reasonable inference other than guilt); *State v. Boitnott,* 443 N.W.2d 527, 532 (Minn.1989); *State v. Anderson,* 379 N.W.2d 70, 75, 78 (Minn.1985) (requiring that the evidence make a theory consistent with innocence seem unreasonable), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). Nevertheless, the jury determines the credibility and weight of circumstantial evidence and we must continue to assume that the jury believed the State's witnesses. *E.g., Bias,* 419 N.W.2d at 484–86 (deferring to the jury's presumed credibility evaluations and upholding a conviction for first-degree felony murder based on circumstantial evidence); *State v. Race,* 383 N.W.2d 656, 662 (Minn.1986). The State concedes that this standard of review applies to appellant's challenge.

The evidence was sufficient for the jury to conclude that appellant intended to commit

second-degree criminal sexual conduct with force or violence when he was interrupted by his murder victim. Contrary to appellant's contention on appeal, the circumstantial evidence of his intent included far more than the unbuckling of his belt. Appellant lured Lott into his empty apartment, locked the door, directed her into his bedroom at the back of his apartment, forced her onto a bed, held her down, threatened her with a knife to her neck, told her to shut up, used bed sheets to bind her wrists and gag her, and unbuckled and began to remove the belt on his pants. When Lott offered him money to set her free, appellant was apparently uninterested. Considering the evidence in a light most favorable to the verdict and the totality of the circumstances, the jury could reasonably conclude that the only plausible inference to be drawn was that appellant intended to commit a sex crime against Lott. *See Bias*, 419 N.W.2d at 486; *State v. Loss*, 295 Minn. 271, 280–82, 204 N.W.2d 404, 409–10 (1973) (upholding a first-degree manslaughter conviction based entirely on circumstantial evidence, and noting the improbability that the injuries could have been suffered by a 2–foot fall, as claimed by the defense); *State v. Johnson*, 243 Minn. 296, 297–301, 67 N.W.2d 639, 641–43 (1954) (upholding an attempted rape conviction despite the absence of sexual contact or verbal indication of intent).

■ Finally, Lott's contemporaneous reaction to appellant's conduct is evidence relevant to proving appellant's intent. *See State v. Schweppe*, 306 Minn. 395, 400–01, 237 N.W.2d 609, 614 (1975). Although Lott was uncertain as to exactly what appellant intended to do, she did testify that she believed appellant was going to rape her. Paul Williams also testified that, soon after the assault, Lott told him that someone had just tried to rape her. The jury was free to credit Lott's reaction as evidence that appellant intended to sexually contact her. *See* Minn.Stat. § 609.341, subd. 11(a) (defining sexual contact).

Appellant proposes alternative theories of his intent, but none are plausible or supported by the record. Appellant asserts that he may have been tightening his belt, but this conclusion seems contrary to Lott's testimony that "he had his belt loose." Appellant also suggests that he was removing his belt to better secure Lott's hands, and during closing argument appellant's counsel surmised that appellant might have intended to hit Lott. These theories do not sustain a conclusion that appellant was innocent—*i.e.*, that appellant did not intend to commit second-degree criminal sexual conduct. Such speculation certainly does not make unreasonable the inference that appellant intended, in any event, to commit first- or second-degree criminal sexual conduct with force or violence. *See Anderson*, 379 N.W.2d at 78; *see also Race*, 383 N.W.2d at 661–62 (requiring that a defendant offer a rational hypothesis consistent with his or her *innocence*). At oral argument before this court, appellant for the first time proposed an additional theory: that appellant's conduct was actually part of a premeditated plan to murder Williams, a crime for which he was not charged. However, there is no evidence in the record of motive or even a relationship between appellant and Williams, and the jury did not return a verdict for second-degree (intentional) murder under Minn.Stat. § 609.19(1). The notion that appellant schemed to bring Williams into his apartment is unsupported by any evidence whatsoever. Appellant's conjectures do not justify reversal. *See State v. Ostrem*, 535 N.W.2d 916, 924 n. 10 (Minn.1995) (noting that the defendant failed to identify evidence in the record supporting an alternative theory).

In his pro se supplemental brief, appellant raises several additional claims, all of which lack merit. After a careful review of the record, we conclude that the admission of the recording of Jones's 911 call was proper, *see* Minn.R.Evid. 803(2); *State v. Edwards*, 485 N.W.2d 911, 912, 914 (Minn.1992) (overruling, as an abuse of discretion, the exclusion of excited utterances to a 911 operator by a mother and daughter that the daughter had been sexually abused); that the evidence was sufficient without the forensic testing now demanded by appellant; that, on the limited record before us, counsel was not ineffective, *see State v. Ecker*, 524 N.W.2d 712, 718 (Minn.1994) (stating that a defendant has an affirmative obligation to show that an addi-

tional witness would have been found by counsel if an effort was made, and that the witness's testimony would have made a difference in the outcome of the proceeding); and that appellant's other contentions are either irrelevant, unsupported by the evidence, inadequate grounds for relief, or improperly raised for the first time on appeal, *see State v. Roby,* 463 N.W.2d 506, 508 (Minn.1990).

Affirmed.